# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLOIRDA
## ORLANDO DIVISION

**CASE NO.: 6:09-bk-06245-KSJ**
**CHAPTER 11**

IN RE: KA and KM DEVELOPMENT,
INC.,

                        Debtor,

JAMES FRANCIS ROONEY and
TERESA ROONEY,                                              **ADV. PROC. NO.: _____**

                        Plaintiffs,

v.

KA AND KM DEVELOPMENT, INC.,
TITLECONCEPTS, LLC, a Florida
corporation, SUNTRUST BANK,
VINOD KALIDAS, NIRMAKSEE
KALIDAS, and ARTI V. KALIDAS,

                        Defendants.
_____/

## COMPLAINT

Plaintiffs, JAMES FRANCIS ROONEY and TERESA ROONEY (collectively "Plaintiffs"), by and through their undersigned counsel, sues Defendants KA AND KM DEVELOPMENT, INC. ("KAKM"), TITLECONCEPTS, LLC, a Florida corporation, SUNTRUST BANK, VINOD KALIDAS, NIRMAKSEE KALIDAS, and ARTI V. KALIDAS (collectively, "Defendants"), and states:

1.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1334.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Plaintiffs are individuals who entered into contracts for the purchase of condominium units from Defendant, KAKM, and are sui juris.

1

4.     Defendant KAKM is a Florida for profit corporation formed under the laws of the State of Florida having its principal place of business in Orlando, Orange County, Florida, is a developer and seller of condominium properties located in Florida, and is the debtor in the Chapter 11 Bankruptcy proceeding.

5.     Defendant, TITLE CONCEPTS, LLC ("TitleConcepts"), is a Florida limited liability company formed under the laws of the State of Florida, having its principal place of business in Orlando, Orange County, Florida.

6.     Defendant, SUNTRUST BANK ("SunTrust") is a corporation formed under the laws of the State of Georgia, authorized to transact business in the State of Florida and maintains offices in Orlando, Orange County, Florida.

7.     Defendant, VINOD KALIDAS, is an individual who resides in Orange County, Florida, at all relevant times as the President and Director of KAKM, actively solicited and communicated with the Plaintiffs, and is sui juris.

8.     Defendant, NIRMAKSEE KALIDAS, is an individual who resides in Orange County, Florida, at all relevant times was the Treasurer and Director of KAKM and is sui juris.

9.     Defendant, ARTI V. KALIDAS, is an individual who resides in Orange County, Florida, at all relevant times was the Secretary and Director of KAKM, actively solicited and communicated with the Plaintiffs, and is sui juris.

10.     KAKM filed a Chapter 11 Petition for Bankruptcy in this Court on May 6, 2009 (the "Petition Date").

**<u>Factual Allegations</u>**

11.     On or about February 7, 2007, Plaintiffs and KAKM entered into a Contract for Purchase and Sale ("Purchase Agreement") wherein Plaintiffs agreed to purchase Unit 73,

2

12388 International Drive South, Orlando, Florida 32821("Unit"). A copy of the Purchase Agreement is attached as Exhibit "A."

12.     In accordance with the terms and conditions of the Purchase Agreement, Plaintiffs' obligations to close be contingent on their obtaining financing of seventy percent (70%) of the purchase price, at the prevailing interest rate, amortized over thirty (30) years.

13.     Upon signing the Agreement or soon thereafter, Plaintiffs deposited a total of One Hundred Forty-Five thousand Eight Hundred and No/100 ($145,800.00) with KAKM is closing agent, TitleConcepts.

14.     On January 26, 2009, a Certificate of Occupancy was issued covering the Unit.

15.     KAKM used means or instruments of transportation or communications in interstate commerce, or of the mails, in connection with the sale of the Unit by utilizing telephone lines, the internet and the mails in connection with the Plaintiffs.

16.     Plaintiff has engaged the firm of Mario A. Garcia, P.A., to bring this action and has agreed to pay the firm a reasonable fee for its services, and to reimburse all costs advanced in this action.

17.     All conditions precedent to the filing of this action have been performed, waived or excused.

## COUNT I

### VIOLATION OF 15 U.S.C. § 1701-1720

18.     Plaintiffs reallege and incorporate paragraphs 1 through 17 in support of this count.

19.     KAKM is a developer as defined by 15 U.S.C. § 1701(5) of the Interstate Land Sales Full Disclosure Act (the "ILSFDA").

20.     Plaintiffs are purchasers as defined by 15 U.S.C. § 1701(10) of ILSFDA.

3

21.     Pursuant to 15 U.S.C. § 1702, 24 C.F.R. 1710(b) and 61 Fed. Reg. 13,602, ILSFDA applies to the sale of lots, including those in residential, commercial, condominium or industrial buildings.

22.     The Purchase Agreement characterizes the Unit as a condominium. *See* preamble and paragraph 1 of the Purchase Agreement.

23.     ILSFDA applies to the sale of the Unit.

24.     Pursuant to 15 U.S.C. § 1703, a developer is prohibited from making use of any means or instruments of transportation or communications in interstate commerce, or of the mails, in connection with the sale of any real property unless a printed property report meeting the requirements of Section 1707 is furnished to a purchaser in advance of the signing of any contract or agreement for sale by the purchaser.

25.     Pursuant to 15 U.S.C. § 1702(a) (2), the provisions of ILSFDA shall not apply to the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such building thereon within a period of two years.

26.     KAKM has violated 15 U.S.C. § 1703 by failing to furnish a compliant property report to the Plaintiff, and by limiting Plaintiff's remedies in the event of KAKM's breach and by otherwise failing to comply with ILSFDA.

27.     KAKM elected not to furnish the property report to the Plaintiffs as required by 15 U.S.C. § 1703 and instead elected to rely upon an exemption provided for under 15 U.S.C. § 1702.

28.     ILSFDA, 15 U.S.C. § 1703(c)-(e), provides that if a compliant property report is not furnished to the purchaser prior to the purchaser signing any contract or agreement for sale

4

for the property at issue, the purchaser, at his option, may revoke the contract and shall be entitled to all money paid under the contract, including any and all deposits paid.

29.    ILSFDA is intended to protect the public and, according to Florida's Supreme Court, should be liberally construed in favor of the public.

30.    KAKM is not eligible for an exemption because it failed to unconditionally guarantee and commit to complete construction of the Unit within two (2) years.

31.    Plaintiff has made deposits totaling $145,800.00 to Title Concepts.

32.    Pursuant to 15 U.S.C. § 1709, Plaintiffs are entitled to reasonable attorneys' fees, court costs, independent appraisers' fees and travel to and from the Unit.

**WHEREFORE,** Plaintiff demands judgment against KA AND KM Development, Inc., for revocation of the purchase contract, return of their Deposit of $145,800.00, plus compensatory damages, together with attorney fees, pre-judgment interest, and such further relief as this Court deems just.

**COUNT II**

**VIOLATION OF 15 U.S.C. § 77(E) – SECURITIES ACT OF 1933**

33.    Plaintiffs reallege and incorporate paragraphs 1 through 17 in support of this Count.

34.    The Purchase Agreement is a security as defined by 15 U.S.C. §77b (a) (1) of the Securities Act of 1933 (the "Act").

35.    KAKM is a person as defined by 15 U.S.C. §77b (a) (2) of ILSFDA.

36.    Pursuant to 15 U.S.C. §77e, unless a registration statement is in effect as to as security, it shall be unlawful for any person, directly or indirectly to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise.

5

37.     KAKM has failed to file a registration statement as required by 15 U.S.C. §77e.

38.     KAKM has violated 15 U.S.C. §77e by failing to file a registration statement.

39.     The Act, 15 U.S.C. §77l, provides that if any person offers or sells a security in violation of §77e of this title, the person shall be liable to the person purchase the security for the consideration paid for such security with interest thereon.

40.     The Act, 15 U.S.C. § 77l, provides that if any person sells a security by means of a prospectus or oral communications, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of circumstances under which they were made, not misleading, the person shall be liable to the person purchasing the security for the consideration paid for such security with interest thereon.

41.     Every person who controls any person liable under 15 U.S.C. § 77l shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable.

42.     Defendants VINOD KALIDAS, NIRMAKSEE KALIDS, and ARTI V. KALIDAS are the sole officers and directors of KAKM and control KAKM.

43.     ILSFDA, 15 U.S.C. §77n, provides that any condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of ILSFDA shall be void.

44.     ILSFDA is to be liberally construed in favor of protecting the investing public.

45.     The Purchase Agreement is an investment contract as defined by ILSFDA.

46.     The Purchase Agreement requires the investment of money by the Plaintiffs.

47.     The Purchase Agreement pertains to a common enterprise as it entails the purchase of one of 176 units to be used as part of a resort condominium hotel.

48.     The Purchase Agreement contemplates the expectation of profits to be derived solely from the efforts of others.

49.     On or around August 2008, KAKM for the first time advised Plaintiffs that the Unit is a commercial investment nature as part of a resort condominium hotel to be professionally managed by Sky Resort Management, LLC, via a management agreement which would significantly restrict Plaintiff's use rights.

50.     The Plaintiffs, and other purchasers, are dependant on the efforts of the KAKM or its agents to make a profit.

51.     The Plaintiffs are subject to financial loss.

**WHEREFORE,** Plaintiffs JAMES FRANCIS ROONEY and TERESA ROONEY, demand judgment against the KA AND KM Development Inc., for revocation of the Purchase Agreement, return of the Deposit or $145,800.00, plus compensatory damages, together with attorney fees, pre-judgment interest, and such further relief as this Court deems just.

## COUNT III

### VIOLATION OF FLORIDA STATUTES CHAPTER 517
### FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

52.     Plaintiffs reallege and incorporate paragraphs 1 through 17 in support of this Count.

53.     The Purchase Agreement is a security as defined by Florida Statutes §517.02(21) (q), Chapter 517 (the "Florida Act").

54.     KAKM is a person for purposes of the Florida Act.

55.     KAKM is an issuer for purposes of the Florida Act.

56.     The Florida Act is to be given a broad and liberal interpretation to effectuate its purpose of protecting the public.

57.     Pursuant to Florida Statutes §517.07, unless a security is exempt or registered, a security shall not be sold or offered for sale within the State of Florida.

58.     The Purchase Agreement is not exempt from the requirements of Florida Statutes Chapter 517 and the burden of establishing the right to any exemption is upon the KAKM.

59.     Pursuant to Florida Statutes §517.07, unless a security is exempt or a prospectus meeting the requirements of rules adopted by the commission are furnished to the purchaser prior to each sale, a security shall not be sold or offered for sale within the State of Florida.

60.     The Purchase Agreement is not exempt from the requirements of Florida Statutes Chapter 517 and burden of establishing the right to any exemption is upon KAKM.

61.     KAKM failed to register the Purchase Agreement as required by Florida Statutes Chapter 517.

62.     KAKM failed to secure a permit to sell securities as required by Florida Statutes Chapter 517.

63.     Pursuant to Florida Statutes §517.12(1), no issuer of securities shall sell or offer for sale any securities in or from offices in the State of Florida, by mail or otherwise, unless the person has been registered with the State of Florida Office of Financial Regulation pursuant to the Florida Act.

64.     Pursuant to Florida Statutes §517.02(20), sale means any contract for sale of any investment, security, or interest in a security, for value.

65.     Pursuant to Florida Statutes §517.211, every sale made in violation of Florida Statutes §517.07 or 517.21(1), may be rescinded at the election of the purchaser and each

8

person making the sale and every director, officer, partner, or agent of or for the KAKM may be held jointly and severally liable to the Plaintiffs in an action for rescission.

66.    KAKM has violated the Florida Act.

67.    Pursuant to §517.211(6), Fla. Stat., Plaintiffs are entitled to an award of reasonable attorney's fees.

68.    Pursuant to Florida Statutes §517.241(3), the Plaintiffs are entitled to the same civil remedies provided by the United States for the purchasers of securities including an award of interest.

**WHEREFORE**, Plaintiffs, JAMES FRANCIS ROONEY and TERESA ROONEY, demand judgment against KA and KM Development Inc., for revocation of the Purchase Agreement, return of the Deposit or $145,800.00, plus compensatory damages, together with attorney fees, pre-judgment interest, and such further relief as this Court deems just.

## COUNT IV

## VIOLATION OF FLORIDA STATUTES §718.506

69.    Plaintiffs reallege and incorporate paragraphs 1 through 17 in support of this count.

70.    Prior to the Plaintiffs signing the Purchase Agreement, KAKM published and provided to the Plaintiffs information on the Unit square footage would be 713 square feet interior, 81 square feet balcony, for a total of 794 square feet for a Primrose 1 bedroom/1bath; 1092 square feet interior, 95 square feet balcony, for 1187 total square feet, for an Orchid 2 bedroom/2 bath; 1172 square feet interior, 85 square feet balcony, for 1257 total square feet, for an Orchid Corner 2 bedroom/2 bath; and 1357 square feet interior, 107 square feet balcony, for 1464 total square feet, for a Jasmine 3 bedroom/2 bath as reflected in internet advertising material, brochures, and other materials provided to the Plaintiffs by the Defendant.

71.     The square footage of the Unit is a material statement or information because it goes to the very essence of a condominium unit, which entails the purchase of the right to exclusively occupy a certain area within the condominium building and does not include the exclusive ownership of any land associated with the condominium building.

72.     At the time that KAKM provided the information, it knew, or should have known, that the actual Unit square footage would be significantly less.

73.     Plaintiffs reasonably relied upon the material statement or information regarding the Unit square footage and, in reliance thereupon, paid deposits and entered into the Purchase Agreement to purchase the Unit.

74.     The Unit square footage representations made by the KAKM to the Plaintiffs were false and misleading because the actual Unite square footage is less than represented.

75.     Prior to the Plaintiffs signing the Purchase Agreement, Defendant published and provided them with information regarding various aspects of the condominium building and Unit as reflected in internet advertising material, brochures, and other materials provided to the Plaintiffs by KAKM.

76.     The referenced representations and information included, but are not limited to the following:

        a.      The development housing the Unit would include an oversized, heated pool, approximately 2,729 square feet in size with a shallow end depth of three feet and a maximum deep end depth of five feet.

        b.      The development housing the Unit would include an approximately 4,418 square foot pool deck.

        c.      The development housing the Unit would include an approximately 144 square foot children's wading pool.

d. The development housing the Unit would include an approximately 64 square foot spa.

e. The development housing the Unit would include a children's pool and activity area.

f. The development housing the Unit would include a fitness center.

The development housing the Unit would include a full service, casual restaurant and outdoor bar and grill.

g. The development housing the Unit would include over 900 square feet of convention and meeting space and specialized staff.

h. The development housing the Unit would include a resort gift and sundry shop offering the finest selection of souvenirs and sundry items.

i. The development housing the Unit would include a game room.

j. The development housing the Unit would include a valet laundry services.

k. The Unit would be subject to a monthly assessment of $257.28, $394.05, $422.91 or $489.67, depending on whether it was a Primrose, Orchid, Orchid Corner or Jasmine Unit, respectively. (hereinafter sometimes collectively referred to as, "Representations").

77. The Representations are material statements or information because they pertain to the Plaintiffs' financial, ownership, use and other rights and obligations upon closing on the purchase of the Unit.

78. At the time that Defendant provided the information, it knew, or should have known, that the information was false and would be changed as reflected in the amendments and changes made by the Defendant and the actual square footage and amenities as built.

79. The Plaintiffs reasonably relied upon the material statement or information regarding the Unit square footage, building amenities square footage and capacity, use rights and

11

other representations and, in reliance thereupon, paid deposits and entered into the Purchase Agreement to purchase the Unit.

80. At that time that the Defendant provided the information regarding the Unit square footage, building amenities square footage and capacity, use rights and other representations, it knew, or should have known, that the actual square footage and capacity, use rights and other representations were materially and adversely different.

81. Pursuant to Florida Statutes §718.506, any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction.

82. Pursuant to Florida Statutes §718.506(2), Plaintiffs are entitled to an award of reasonable attorneys' fees and costs.

83. Plaintiffs have paid deposits totaling $145,800.00.

**WHEREFORE**, Plaintiffs JAMES FRANCES ROONEY and TERESA ROONEY demand judgment against the Defendant, KM and KA Development, Inc., for rescission of the Second Purchase Agreement, release of their deposit of $145,800.00, plus compensatory damages, together with attorney fees, prejudgment interest, costs, and such further relief as this Honorable Court deems just.

## COUNT V

## VIOLATION OF FLORIDA STATUTES §718.506

12

84.     Plaintiffs reallege and incorporate paragraphs 1 through 17, in support of this count.

85.     Prior to the Plaintiffs signing the Purchase Agreement, the KAKM published and provided to the Plaintiffs information on the Unit square footage would be 713 square feet interior, 81 square feet balcony, for a total of 794 square feet for a Primrose 1 bedroom/1bath; 1092 square feet interior, 95 square feet balcony, for 1187 total square feet, for an Orchid 2 bedroom/2 bath; 1172 square feet interior, 85 square feet balcony, for 1257 total square feet, for an Orchid Corner 2 bedroom/2 bath; and 1357 square feet interior, 107 square feet balcony, for 1464 total square feet, for a Jasmine 3 bedroom/2 bath as reflected in internet advertising material, brochures, and other materials provided to the Plaintiffs by the KAKM.

86.     The square footage of the Unit is a material statement or information because it goes to the very essence of a condominium unit, which entails the purchase of the right to exclusively occupy a certain area within the condominium building and does not include the exclusive ownership of any land associated with the condominium building.

87.     At the time that KAKM provided the information, it knew, or should have known, that actual Unit's square footage would be significantly less.

88.     Plaintiffs reasonably relied upon the material statement or information regarding the Unit square footage and, in reliance thereupon, paid deposits and entered into the Purchase Agreement to purchase the Unit.

89.     The Unit square footage representations made by the KAKM to the Plaintiffs were false and misleading because actual Unit's square footage is less than represented by the KAKM.

90.     Prior to the Plaintiffs signing the Purchase Agreement, KAKM published and provided to the Plaintiffs information regarding various aspects of the condominium building and

13

Unit as reflected in internet advertising material, brochures, and other materials provided to the Plaintiffs by the KAKM.

91. The referenced representations and information include, but are not limited to the following:

a. The development housing the Unit would include an oversized, heated pool, approximately 2,729 square feet in size with a shallow end depth of three feet and a maximum deep end depth of five feet.

b. The development housing the Unit would include an approximately 4,418 square foot pool deck.

c. The development housing the Unit would include an approximately 144 square foot children's wading pool.

d. The development housing the Unit would include an approximately 64 square foot spa.

e. The development housing the Unit would include a children's pool and activity area.

f. The development housing the Unit would include a fitness center.

g. The development housing the Units would include men's and women's saunas.

h. The development housing the Unit would include a full service, casual restaurant and outdoor bar and grill.

i. The development housing the Unit would include over 900 square feet of convention and meeting space and specialized staff.

j. The development housing the Unit would include a resort gift and sundry shop offering the finest selection of souvenirs and sundry items.

k.     The development housing the Unit would include a game room.

l.     The development housing the Unit would include a valet laundry services.

m.     The Unit would be subject to a monthly assessment of $257.28, $394.05, $422.91 or $489.67, depending on whether it was a Primrose, Orchid, Orchid Corner or Jasmine Unit, respectively. (hereinafter sometimes collectively referred to as, "Representations")

92.     The Representations are material statements or information because they pertain to the Plaintiffs' financial, ownership, use and other rights and obligations upon closing on the purchase of the Unit.

93.     At the time that KAKM provided the information, it knew, or should have known, that the information was false and would be changed as reflected in the amendments and changes made by the KAKM and the actual square footage and amenities as built.

94.     The Plaintiffs reasonably relied upon the material statement or information regarding the Unit square footage, building amenities square footage and capacity, use rights and other representations and, in reliance thereupon, paid deposits and entered into the Purchase Agreement to purchase the Unit.

95.     At that time that the KAKM provided the information regarding the Unit's square footage, building amenities square footage and capacity, use rights and other representations, it knew, or should have known, that the actual square footage and capacity, use rights and other representations were materially and adversely different.

96.     Pursuant to Florida Statutes §718.506, any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this

state shall have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction.

97.     Pursuant to Florida Statutes §718.506(2), Plaintiffs are entitled to an award of reasonable attorneys' fees and costs.

98.     Plaintiffs have paid deposits totaling $145,800.00.

**WHEREFORE**, Plaintiffs JAMES FRANCES ROONEY and TERESA ROONEY demand judgment against KA AND KM Development, Inc., for rescission of the Purchase Agreement, release of their Deposit or $145,800.00, plus compensatory damages, together with attorney fees, prejudgment interest, costs, and such further relief as this Honorable Court deems just.

## COUNT VI

### VIOLATIONS OF FLORIDA STATUTES §501.201 ET SEQ

99.     Plaintiffs reallege and incorporate paragraphs 1 through 17, 19 through 31, and 85 through 98, in support of this count.

100.     This count is brought pursuant to Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201 et seq ("FDUTPA").

101.     Pursuant to Florida Statutes §501.202, FDUTPA is to be construed liberally to, inter alia, promote the policies of simplifying, clarifying and modernizing the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices, as well as to protect the consuming public and to make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

16

102.     Pursuant to Florida Statute §501.203(3) (c), a violation of any law, statute, rule, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices is a per se violation of FDUTPA.

103.     As set for in *Trotta v. Lighthouse Point Land Company, LLC,* 551 F. Supp.2d 1359, 1367 (S.D. Fla. 2008), a violation of ILSFDA is a per se violation of FDUTPA.

104.     Because the KAKM has violated ILSFDA, it has violated FDUTPA.

105.     The Securities Act of 1933, similar to ILSFDA, was enacted by the United States Legislature to protect the public, as such, a violation of the Securities Act of 1933 is a per se violation of FDUTPA.

106.     Because the KAKM has violated the Securities Act of 1933, it has violated FDUTPA.

107.     Florida Statutes Chapter 517, similar to the Securities Act of 1933, was enacted by the Florida legislature to protect the public, as such, a violation of Florida Statutes Chapter 517 is a per se violation of FDUTPA.

108.     Because the KAKM has violated Florida Statutes Chapter 517, it has violated FDUTPA.

109.     As set forth in *Asbury Arms Development Corporation v. Florida Department of Business Regulations, Division of Florida Land Sales and Condominiums,* 456 so. 2d 1291, 1293 (Fla. 2d DCA 1984), the Florida legislature enacted Florida Statutes Chapter 718 to protect the public, as such, a violation of Florida Statutes Chapter 718, and specifically Florida Statutes §§718.503 and 718.506, is a per se violation of FDUTPA.

110.     As the KAKM has violated Florida Statutes Chapter 718, it has violated FDUTPA.

111. Pursuant to Florida Statutes §501.211(1), without regard to any other remedy or relief to which the Plaintiffs are entitled, Plaintiffs may bring an action to enjoin the KAKM from violating FDUTPA.

112. Pursuant to FDUTPA, the Plaintiffs are entitled to equitable relief in the form of rescission of the Purchase Agreement and enjoinment of the KAKM from enforcing any terms of the Purchase Agreement.

113. Pursuant to FDUTPA, Plaintiffs are entitled to a declaratory judgment that the KAKM has violated FDUTPA and that the KAKM's failure to comply with ILSFDA, the Securities Act of 1933, Florida Statutes Chapter 517 and Florida Statutes Chapter 718 constitute violations of FDUTPA.

114. Pursuant to Florida Statutes §501.211(2), the Plaintiffs are entitled to recover from the KAKM their actual damages plus attorneys' fees and court costs.

**WHEREFORE**, Plaintiffs JAMES FRANCES ROONEY and TERESA ROONEY demand judgment against KA AND KM Development, Inc., for rescission of the Purchase Agreement, release of their deposit or $145,800.00, plus compensatory damages, together with attorney fees, prejudgment interest, costs, and such further relief as this Honorable Court deems just.

**COUNT VII**

**BREACH OF CONTRACT**

116. Plaintiffs reallege and incorporate paragraphs 1 through 17 in support of this count.

117. The Purchase Agreement provides that Plaintiffs may void and cancel it within 15 days after the date of its execution and receipt by the Plaintiff of all the items required to be delivered to Plaintiff by the KAKM under Florida Statutes, 718.503.

118. The Purchase Agreement also provides that Plaintiff may void and cancel it within 15 days after the date of receipt from KAKM any amendments which materially alter or modify the offering in a manner that is adverse to the Plaintiff.

119. Paragraphs 14 and 29 of the Purchase Agreement provide that Plaintiffs may void and cancel the Purchase Agreement within 15 days after the date of execution of the Purchase Agreement and receipt by the Plaintiffs of all of the items required to be delivered to Plaintiffs by the KAKM under Florida Statutes §718.503.

120. Paragraphs 14 and 29 of the Purchase Agreement provide that Plaintiffs may void and cancel the Purchase Agreement within fifteen (15) days after the date of receipt from the KAKM of any amendments which materially alter or modify the offering in a manner that is adverse to the Plaintiffs.

121. Paragraph 5 of the Purchase Agreement provides that Plaintiffs shall not be obligated to close on the purchase of the Unit until the KAKM has recorded the Declaration of Condominium and related documents in the public record and has obtained a temporary or permanent certificate of occupancy for or covering the Common Elements of the Condominium and the Unit from the proper government agency.

122. Paragraph 10 of the Purchase Agreement conditions Plaintiffs obligation to close upon their ability to obtain financing for seventy percent (70%) of the Purchase Price on a thirty (30) year mortgage at the current market interest rate or within five (5) percentage points as of the date of the Purchase Agreement.

123. Plaintiffs have provided written notice to KAKM of their inability to obtain financing in accordance with paragraph 10 of the Purchase Agreement.

124. KAKM materially breached the Purchase Agreement thereby excusing any further performance by Plaintiffs, by failing to provide the items required to be delivered to Plaintiff

19

by the KAKM under Florida Statutes 718.503 and/or failing to deliver to Plaintiffs amendments which materially alter or modify the offering in a manner that is adverse to the Plaintiffs, including, but not limited to, the recorded Declaration of Condominium and by failing to honor Plaintiffs' rescission and termination rights contained in the Purchase Agreement.

125. Through today's date, the property report, and the Declaration do not accurately reflect the location, plans, specifications or completion date of the Unit.

126. The KAKM materially breached the Purchase Agreement by failing to comply with its obligations under the Purchase Agreement, which were conditions precedent to the Plaintiffs' obligation to close on the purchase of the Unit.

127. Paragraph 7 of the Purchase Agreement provides that if the KAKM defaults under any of its provisions, Plaintiffs shall have the right to terminate it by giving written notice to the KAKM, whereupon the deposits paid by the Plaintiffs shall be immediately returned to Plaintiffs.

128. Plaintiffs have paid deposits totaling $145,800.00.

129. Pursuant to Paragraph 7 of the Purchase Agreement, and Florida Statutes §57.105(7), the Plaintiffs are entitled to recover Plaintiffs' attorneys' fees and costs from the KAKM.

**WHEREFORE**, Plaintiffs, JAMES FRANCIS ROONEY and TERESA ROONEY, demand judgment against KA and KM DEVELOPMENT, INC., for rescission of the Purchase Agreement, return of the deposit or a final judgment in the sum of $145,800.00, plus other damages, prejudgment interest, court costs, and such further relief as this Court deems just.

## COUNT VIII

## DECLARATORY RELIEF

130.    Plaintiffs reallege and incorporate paragraphs 1 through 17 and 19 through 11932, 34-51, 53-68, 70-83, 85-97, 101-113, 117-129 in support of this count.

131.    This is an action against TitleConcepts, LLC pursuant to Florida Statutes, Chapter 86 – Declaratory Judgments.

132.    Pursuant to the Purchase Agreement, TitleConcepts, LLC is holding Plaintiff's deposits totaling $145,800.00.

133.    The Plaintiffs' deposits paid pursuant to the Contracts of Purchase and Sale are not property of the bankruptcy estate or KAKM.

134.    Congress has generally left the determination of property rights in the assets of bankrupt's estate to state law. Butner v. United States, 440 U.S. 48 (1979).

135.    Pursuant to 11 U.S.C. §541(d), the bankruptcy estate cannot succeed to a greater interest in property than KAKM held prior to the bankruptcy.

136.    Under Florida law legal law to the Plaintiffs' deposits paid pursuant to the Contracts for Purchase and Sale remains with the Plaintiffs until closing on the purchase of the Units.

137.    None of the Plaintiffs have closed on any of the sales contemplated by the Contract for Purchase and Sale.

138.    The Plaintiffs are entitled to recover their entire deposits paid, plus attorney's fees, costs and interest, pursuant to the Contracts for Purchase and Sale.

139.    Pursuant to the Contracts for Purchase and Sale, TitleConcepts, LLC., as escrow agent, in holding all, or a portion totaling no less than ten percent (10%) of the purchase price

set forth in each Contract for Purchase and Sale, of the Plaintiffs' deposits totaling $145,800.00.

140. Pursuant to Section 7 of the Contracts for Purchase and Sale, and Florida Statutes, § 57.105(7), the Plaintiffs are entitled to recover Plaintiffs' attorney's fees and costs from KAKM.

141. To the extent that any of the Plaintiffs' deposits were released to KAKM, they were utilized only for costs related directly to the purchase and construction of the building housing the Units.

142. The Plaintiffs paid the deposits prior to the SunTrust Mortgage.

143. There is a present dispute between the Plaintiff and KAKM as to who is entitled to possession, custody and control of the deposit.

144. For the multiple reasons set forth in the above counts, Plaintiffs maintain that they is entitled to the immediate return of all funds being held by TitleConcepts, LLC on their behalf and/or in connection with the Purchase Agreement.

145. Despite demanding that KAKM instruct TitleConcepts, LLC to return the deposit, KAKM has failed or refused to do so.

146. Plaintiffs have no adequate remedy at law, and there is a bona fide action present and a practical need for declaratory judgment; the above facts are present and certain; the Purchase Agreement, and Federal and state statutes control the disposition of this action; the interest and subject matter between Plaintiffs and KAKM is adverse; this action does not seek legal advice, and Plaintiffs are in doubt as to his rights, liabilities and obligations under the facts and circumstances set forth above, and requests that this Honorable Court declare the respective rights, liabilities, and obligations of the respective parties as they may exist under the terms and conditions of the Purchase Agreement.

22

**WHEREFORE,** Plaintiffs JAMES FRANCIS ROONEY and TERESA ROONEY request a declaratory judgment declaring that Plaintiffs are entitled to the full return of their deposit, and ordering TitleConcepts to either deliver and release the funds to Plaintiffs, and/or enter a final judgment against TitleConcepts, LLC for $145,800.00 plus any interest accrued on said amount, court costs, and any such other relief this Honorable Court deems just.

## COUNT IX

### UNJUST ENRICHMENT

147.     Plaintiffs reallege and incorporate paragraphs 1 through 12 and 107 through 119 in support of this count.

148.     KAKM and TitleConcepts, LLC, jointly and severally, knowingly and voluntarily accepted, received and retained $145,800.00 in deposits paid by the Plaintiffs.

149.     KAKM and TitleConcepts, LLC, jointly and severally, accepted Plaintiffs' $145,800.00 in deposits with the understanding that the funds were being provided by Plaintiffs as a deposit in the event that KAKM accepted the Purchase Agreement prior to revocation by the Plaintiffs.

150.     Despite demand by Plaintiffs upon KAKM and TitleConcepts, LLC, for the return of the funds, KAKM and TitleConcepts, LLC, have failed or refused to return the funds to Plaintiff.

151.     Under the circumstances it would be inequitable for KAKM or TitleConcepts, LLC, to retain Plaintiffs' funds.

152.     The value of Plaintiffs' funds is $145,800.00.

**WHEREFORE,** Plaintiffs JAMES FRANCIS ROONEY and TERESA ROONEY demand judgment against KAKM for $145,800.00, plus pre-judgment interest, court costs, and such other and further relief as this Honorable Court deems just.

## COUNT X

### EQUITABLE LIEN

153. Plaintiffs reallege and incorporate paragraphs 1 through 12 and 107 through 119 in support of this count.

154. Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. Butner v. United State. 440 U.S. 48 (1979).

155. Pursuant to 11 U.S.C. § 541(d), the bankruptcy estate cannot succeed to a greater interest in property than KAKM held prior to the bankruptcy.

156. The Plaintiffs are entitled to recover their entire deposits paid, plus attorney's fees, costs and interest, pursuant to the Contract for Purchase and Sale.

157. None of the Plaintiffs have closed on any of the sales contemplated by the Contract for Purchase and Sale.

158. A portion of the Plaintiffs' deposits was released to KAKM and pursuant to the Contracts for Purchase and Sale terms, utilized for costs related directly to the construction of the building housing the Units.

159. SunTrust was aware of and had actual notice of the deposits paid by the Plaintiffs.

160. SunTrust had constructive notice of the deposits paid by the Plaintiffs.

161. SunTrust conditions its loan to KAKM on the payment of deposits by the Plaintiffs and other purchasers.

**WHEREFORE**, Plaintiffs demand judgment against SunTrust finding and adjudicating that the Plaintiffs hold an equitable lien on the real property owned by KAKM in the amount of $145,800.00, plus other damages, together with attorney's fees and costs, pre-judgment interest, costs, which is superior to the SunTrust Mortgage and any other SunTrust mortgage or lien interest, and granting the Plaintiffs such further relief as this Court deems just and proper.

162. On June 21, 2007, SunTrust entered into a Mortgage, Assignment of Rents and Security Agreement with KAKM (the "SunTrust Mortgage"), a copy of the SunTrust Mortgage

24

which was recorded in the official records in and for Orange County, Florida, on June 22, 2007, is attached hereto as Exhibit "B."

163. The SunTrust Mortgage was made after the Plaintiffs' deposits were released to KAKM.

164. The SunTrust Mortgage loan proceeds were paid to, or on behalf of, KAKM after the Plaintiffs' deposits were released to KAKM.

165. The Plaintiffs are entitled to an equitable lien on the real property and improvements to the real property owned by KAKM, including, without limitation, that described in the SunTrust Mortgage.

166. The SunTrust Mortgage, and any subsequent SunTrust mortgage or other interest, is inferior to the equitable lien of the Plaintiffs.

167. It would be unjust and inequitable to allow the SunTrust Mortgage to be superior to the pre-SunTrust Mortgage paid and disbursed Plaintiffs' deposit funds, which were used in the actual development and construction of the building housing the Units.

DATED this 18th day of August 2009.

Mario A. Garcia
MARIO A. GARCIA, ESQ.
MARIO A. GARCIA, P.A.
400 N. Fern Creek Avenue
Orlando, Florida 32803
(407)447-9000
(407)447-9003 (Fax)
FLA. BAR NO.: 0754986
Email: office@mariogarcialaw.com

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A PURCHASER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

## CONTRACT FOR PURCHASE AND SALE

### VILLAS AT LAKE EVE, A CONDOMINIUM

Seller/Developer: KA & KM Development, Inc.

Purchaser(s): Mr. James Francis Rooney & Mrs. Teresa Rooney

X Married ☐ Single

Social Security # N/A
Spouse Social Security # N/A

Contract Date: February 6, 2007

Mailing Address: ~~25 Fathom Line~~ 82 NEWRY ROAD, MAYOBRIDGE,
Newry, Down ~~BT35 8QN~~ BT34 2EU
                                                     3085S1723
Home Telephone No:        028 ~~30 26 23 40~~   Work Telephone No: 028 3085 1723
Mobile Telephone No:      07775 503 303
Fax No:                   E – Mail: teresarooney82@aol.com

Condominium Address:  12388 International Drive South, Orlando, FL 32821
# 713

Closing Date:

In consideration of the purchase price specified below, the mutual covenants and benefits provided for herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto do hereby agree as follows:

1.     GENERAL.  Seller agrees to sell, and Purchaser agrees to purchase, in accordance with the terms and conditions of this Contract For Purchase and Sale ("Contract"), the Unit referenced above ("Unit") of Villas at Lake Eve, a Condominium ("Condominium").  The Condominium is or shall be created pursuant to the Declaration of Condominium for Villas at Lake Eve, a Condominium ("Declaration"), which is or shall

*Exhibit A*

be recorded in the public records of Orange County, Florida. The Unit, together with its percentage of undivided interest in the Common Elements of the Condominium, is more particularly described in the Declaration. The Unit shall be purchased for the purchase price and under the terms and conditions set forth below and elsewhere in this Contract.

| Unit Price: | $486,000.00 |
|---|---|
| **Total Purchase Price:** | $486,000.00 |

| Deposit Made This Date: | $1967.40 |
|---|---|
| Additional Deposit Required from Purchaser | $143,832.60 |
| Cash From Purchaser Due at Closing: | |
| Cash From Lender Due at Closing: | $340,200.00 |
| **Total Cash Due at Closing From All Sources:** | $486,000.00 |

2.    PURCHASE PRICE. The total purchase price of the Unit shall be as set forth in paragraph 1 above and as set forth in any addendum to this Contract, and shall be paid as follows:

       (a)   All deposits made by Purchaser under Paragraph 1 ("Earnest Money") shall be considered for Seller reserving the Unit for Purchaser. The Earnest Money shall be deposited in the Escrow Account of TitleConcepts, LLC ("Escrow Agent") pursuant to Section 718.202, Florida Statutes and an Escrow Agreement between Seller and Escrow Agent. Such Escrow Account shall be designated for the deposit of earnest monies received by Seller with respect to Units within the Condominium, and shall not be commingled with any other funds of Seller. The mailing address of the Escrow Agent is 55 East Pine Street, Orlando, FL 32801. All notices and claims of Purchaser with respect to the aforesaid escrow deposits shall be sent to the Escrow Agent at its address set forth above. Escrow Agent shall give Purchaser a receipt for his deposit upon his request. If Purchaser terminates this Contract without defaulting, Seller shall refund all deposits. If Purchaser defaults, Seller will be entitled to retain all deposits. Purchaser will be required to authorize disbursement of escrowed funds by the Escrow Agent to Seller at closing. Prior to disbursing Earnest Money in the event of a default hereunder, Escrow Agent shall give all parties fifteen (15) days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Escrow Agent prior to the end of the fifteen (15) day notice period. All objections not raised in a timely manner shall be waived. In the event a timely objection is made, Escrow Agent shall consider the objection and in his or her reasonable discretion, shall do any or a combination of the following: (i) hold the Earnest Money for a reasonable period of time to give the parties an opportunity to resolve the dispute: (ii) disburse the Earnest Money and so notify all parties; and/or (iii) interplead the Earnest Money into a court of competent jurisdiction. Escrow Agent shall be reimbursed for, and may deduct from the funds in escrow, Escrow Agent's costs and expenses of the interpleader action, including reasonable

2

 Purchaser
Purchaser

attorneys' fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Escrow Agent. No party shall seek damages from Escrow Agent, nor shall Escrow Agent be liable for the same.

(b) The balance of the purchase price and all other amounts due including but not limited to fees and costs shall be paid in certified funds at the time of Closing.

3.    <u>PRORATIONS.</u>

BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(a)    <u>Ad Valorem Taxes</u>

(i)    Purchaser acknowledges that, as of the year in which Closing takes place, the Unit may not have been a separately described and assessed Unit of real estate and that in that event, ad valorem taxes for the Unit for the year in which Closing may be assessed under a tax bill in the name of Seller which covers additional Unit. Should the Unit not be separately described and assessed parcel of real estate, Purchaser agrees to pay Seller at Closing that portion of the tax for the year in which closing takes place (based on the prior year if the tax bill for the year in which closing takes place is not yet available) which shall be determined by multiplying the total tax bill by the percentage interest in the Common Elements assigned to the Unit in the Declaration and then prorating the product of such multiplication as of the date of closing. Seller agrees to pay the entire tax bill before it becomes delinquent and, upon written request from Purchaser or any first mortgagee of the Unit, to provide Purchaser or such mortgagee proof of payment. If the amount allocated to the parties is based upon an estimate and the actual bill varies from the estimate, the party who paid too much shall have the right to adjust the prorated amount and within ten (10) days of receipt of notice, the party who paid too little shall pay any increased amount based on the actual tax bill to the other party.

(ii)    If, in the year in which Closing takes place, the Unit is a separately described and assessed Unit of real estate, then ad valorem taxes applicable to the Unit shall be prorated between the Seller and Purchaser as of the date of Closing. If the amount allocated to Purchaser is based upon an estimate and the actual bill varies from the estimate, the party who paid too much shall have the right to adjust the prorated amount and within ten (10) days of receipt of notice, the party who paid too little shall pay any increased amount based on the actual tax bill to the other party.

3

 Purchaser
Purchaser

Before Seller can require Buyer to close, however, two things must be done:

      (a)    Seller must record the Declaration and related documents in the public records; and

      (b)    Seller must get a temporary (or permanent) certificate of occupancy for or covering the Common Elements of the Condominium and the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be lived in.)

Buyer will be given at least (10) days notice of the date, time, and place of closing. Seller is authorized to postpone closing for any reason and Buyer will close on the new date, time, and place specified in a notice of postponement (as long as at least 3 days notice of the new date time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given orally, by telephone, facsimile, telegraph, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the telephone or facsimile number (as appropriate) on Page 1 of this Agreement, unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the formal notice is given or mailed, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and is not the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Buyer agrees, however, to follow all instructions given in the formal notice and written confirmation.

If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address or telephone or facsimile number, because Buyer has failed to pick up a letter when he has been advised of an attempted deliver or because of any other reason, Buyer will not be relieved of his obligation to close on the schedule date unless Seller agree in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Buyer's request, or if Buyer is a corporation and Buyer fails to produce the necessary corporate papers Seller requests and, as a result, closing is delayed, or if closing ids delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the purchase price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. All prorations will be

5

                                                  Purchaser
                                                  Purchaser

made as of the originally scheduled date. Buyer understands that Seller is not required to reschedule or to permit a delay in closing.

6. CLOSING COSTS. It is understood that Fuel USA is a preferred lender for this Condominium (hereinafter referred to as the "Preferred Lender") and that certain benefits and incentives may be available to purchasers obtaining a mortgage from the Preferred Lender. Should Purchaser use the Preferred Lender to finance the acquisition of the Unit, Seller shall pay up to $5,000 of borrower's closing costs. Should Purchaser use another lender or purchase the Unit on an all cash basis, Purchaser shall pay in cash at closing for the cost of the Owner's policy of title insurance. Irrespective of the lender chosen by Purchaser, Purchaser will pay cost of recording the documentary stamps due upon the recording of the deed, closing fees, examination fees, Lender's title insurance fees including endorsements, lender fees, documentary stamps and intangible taxes due upon the recording of the mortgage, recording fees for the mortgage and Purchaser's attorneys' fees if any. Purchaser shall pay all costs and fees incident to the securing of financing (lender's charges) and the closing of the purchase and sale contemplated hereunder not specifically assigned to the Seller including, but not limited to mortgage insurance premiums, escrow deposits, prepaid interest, all discount points required by any lender, any fees associated with financing regarding the purchase of the Unit.

7. DEFAULT.

(a) Purchaser's Default. Purchaser shall be in default under this Contract in the event that (1) Purchaser fails or refuses to complete and execute all of the instruments required of Purchaser under this Contract promptly or when requested to do so by Seller or lender, if applicable; or (2) Purchaser fails to or refuses to make timely payment of any payments required under the Contract; or (3) Purchaser in any other manner fails to or refuses to perform his obligations under this Contract. In the event of any such default by Purchaser, Seller shall give Purchaser written notice of such default and allow seven (7) days from the date of such notice for Purchaser to cure such default. If Purchaser shall fail to cure such default within such seven (7) day period, the Seller shall, and does hereby have, the unrestricted option to: (1) consider the Purchaser in default under this Contract; (2) retain all sums paid to it hereunder as agreed upon and liquidated damages and in full settlement of any claim for damages; and, (3) terminate all rights of Purchaser under this Contract and, thereupon, the parties hereto will be released and relieved from all obligations hereunder. The provisions herein contained for liquidated and agreed upon damages are bona fide provisions for such and are not a penalty, the parties understanding that by reason of the withdrawal of the Unit from sale to the general public at a time when other parties would be interested in purchasing the Unit, that Seller will have sustained damages, if Purchaser defaults, which damages will be substantial but will not be capable of determination with mathematical precision and, therefore, as aforesaid, the provisions for liquidated and agreed upon damages have been incorporated into this Contract as provisions beneficial to both parties hereto. Purchaser and Seller recognize the impossibility of

6

_____ Purchaser
_____ Purchaser

measuring Seller's damages if Purchaser defaults. In the event any litigation or arbitration is commenced as a result of this Contract and Seller prevails in such litigation or arbitration, the Purchaser shall also be liable for Seller's attorneys' fees and costs resulting therefrom.

(b) <u>Seller's Default</u>. If Seller defaults in the performance of this Contract, Purchaser shall give Seller written notice of such a default and if Seller, within seven (7) days from receipt of such notice shall fail to take action that would cure the default within a reasonable period of time, and if Purchaser has performed all of his obligations hereunder then Purchaser's sole remedy shall not be limited to the termination of this Contract by written noticed delivered to Seller and Escrow Agent and to recover Purchaser's deposit, any interest earned thereon at the rate of one percent (1%) per annum, and reimbursement of actual, reasonable third party expenses, which amount shall be fixed and full liquidated damages, it being acknowledged that it is impossible to more precisely estimate the specific damages to be suffered by Purchaser, but the sum herein anticipated is a reasonable estimate of such damages and the parties hereto expressly acknowledge and agree that Purchaser shall not be entitled (i) to specific performance, or (ii) to prepare, file or record a lis pendens against the Unit, or (iii) to the award of any damages including any damages for purely economic losses other than as set forth herein. Purchaser acknowledges that a material inducement to Seller's decision to sell the Unit to Purchaser is the agreement of Purchaser not to impede or interfere with a subsequent sale of the Unit, and that Seller will be damaged in the event Purchaser fails to comply with the requirements of this Paragraph 7. This contract shall not limit the Purchaser's remedy for the Seller's willful non-performance under this Contract.



8. <u>NOTICES</u>. The delivery of any items and the giving of notice in compliance with this Contract shall be accomplished only by mailing by certified or registered mail, U.P.S., Federal Express, or Airborne Express addressed to the address of the party herein stated. Notice or delivery by mail shall be effective when mailed. Notice or delivery by permitted overnight courier shall be effective the day deposited with such courier.

9. <u>DISPUTES</u>. Seller and Purchaser will cooperate with one another in avoiding and informally resolving disputes between them.

10. <u>FINANCING</u>.

(a) Check the appropriate space.

☐ Purchaser represents to Seller that no mortgage financing is necessary or desirable for Purchaser to complete this transaction and that Purchaser does not desire for this Contract to be contingent upon his ability to obtain financing;

7

_X_ Purchaser
_TL_ Purchaser

☑     Purchaser represents to Seller that Purchaser is in need of a mortgage loan in the principal amount set forth in Paragraph 1 in order to complete this transaction.

    (b)     <u>Financing Contingency.</u>

       If subject to a contingency as set forth in subparagraph (a), above, this Contract is made conditioned upon Purchaser's ability to obtain a loan in the principal amount of not less than 70% of cash due from lender for a term of not less than thirty (30) years, with an interest rate at the current market rate, or within five (5) percentage points, as of the date of this contract. Such loan is to be secured by a first lien on the Unit. Purchaser covenants to apply for such a loan on or before five (5) days from the date of the Seller's acceptance of this Contract and to notify Seller and/or Seller's agent of such application, and to pursue such application diligently. In the event the Purchaser fails to apply for such loan within such period, or does not diligently furnish requested loan information within Purchaser's control within two (2) days of the request therefor, Purchaser shall be in default hereunder and Seller, at its option, may terminate this Contract and retain the Earnest Money as liquidated damages. Purchaser agrees to cooperate fully with Seller and the lender in processing the loan application. Seller or its designated agent is authorized to contact such lender from time to time regarding the status of said loan. "Ability to obtain" as used herein means that Purchaser is qualified to receive the loan described herein based upon the lender's customary and standard underwriting criteria. If purchaser has the ability to obtain the loan referenced herein, Purchaser warrants that, at closing, Purchaser will have sufficient cash to complete the purchase of the Unit. Purchaser further warrants that unless otherwise specified herein, Purchaser does not need to sell or lease other real property in order to complete the purchase of the Unit.

       Purchaser shall provide Seller with written evidence of approval for a loan for purchase of the Unit under the terms and conditions set forth in this Contract on or before thirty (30) days from the date of Seller's acceptance of this Contract. Upon receipt of evidence of loan approval by Seller, this contingency shall no longer apply. In the event that the loan is disapproved and evidence of such disapproval is provided to Seller in writing by Purchaser within said thirty (30) day period, then Purchaser may terminate this Contract, holder shall return the Earnest Money to purchaser, and all further rights, obligations and liabilities created hereunder shall be deemed terminated and of no further force and effect. Should Purchaser not provide evidence of approval or disapproval of loan within said thirty day (30) period, this contingency shall not apply, this transaction shall be considered an all cash transaction, Seller shall pay no closing costs, and should the Purchaser not be able to obtain financing by the closing date, the Earnest Money shall be disbursed to the Seller. Purchaser agrees that a loan with terms consistent with those described herein shall satisfy this loan contingency. Purchaser may also apply for a loan with different terms and conditions and close the transaction provided that (a) all other terms and conditions of this Contract are met, and (b) the new loan does not increase the costs charged to Seller. Purchaser shall be

8

                             _____ Purchaser
                               _____ Purchaser

competent jurisdiction to be invalid, illegal or unenforceable for any reason whatsoever, such illegality, unenforceability, or invalidity shall not affect the remainder of this Contract.

20. **CONSTRUCTION OF CONTRACT.** This Contract concerns the sale of real property located in the State of Florida. This Contract and all of the relationships between the parties hereto, shall be construed and interpreted in accordance with the laws of the State of Florida. Notwithstanding the above, the Purchaser and Seller acknowledge that they have read, understand, and have had the opportunity to be advised by legal counsel as to each and every one of the terms, conditions, restrictions, and effect of all of the provisions of this Contract and every part of the Prospectus, all of which are incorporated herein by reference and made a part thereof, and the Purchaser agrees to the enforcement of any and all of these provisions. It is further agreed that words of any gender used in this Contract shall be held to include any other gender, any words in the singular number shall be held to include the plural wherever applicable, and that captions and paragraph numbers appearing in the Contract are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such paragraph or in any way affect this Contract.

21. **ENTIRE AGREEMENT.** This Contact contains the entire agreement between the parties hereto. No agent, representative, salesman or Officer of the parties hereto has authority to make, or has made, any statements, agreements, or representations, in connection herewith, modifying, adding to or changing the terms and conditions hereof and neither party has relied upon any representation or warranty not set forth in this Contract. No dealings between the parties or customs shall be permitted to contradict, vary, add to, or modify the terms hereof. Purchaser acknowledges, warrants and represents that the Contract is being entered into by Purchaser without reliance upon any representations concerning any potential for future profit, any rental income potential, tax advantages, depreciation or investment potential, and without reliance upon any of its agents, employees or representatives. Notwithstanding anything herein to the contrary, this contract may only be amended, or an addendum created, by written instrument executed by the Purchaser and the Manager of the Developer.

22. **OFFER.** This Contract, as executed by Purchaser, shall constitute an offer to Seller. Seller may accept Purchaser's offer by delivering to Purchaser at least one (1) fully executed original of this Contract bearing the signature of one (1) authorized representative of Seller prior to the time that Purchaser shall notify Seller, in writing, of Purchaser's revocation of this offer. The date of this Contract is the date of acceptance by Seller.

23. **DISCLOSURES REGARDING THE UNIT.** Purchaser acknowledges and agrees that he/she has read and understood the disclosures pertaining to the purchase and sale of the Unit contemplated by this Contract and the Condominium as set forth in the Prospectus and incorporated herein by this reference.

11

 Purchaser
Purchaser

24. **INSPECTION PROCEDURE.**

(a)    Purchaser is required to conduct a personal inspection of the Unit with Seller's representative at a mutually convenient time during Seller's normal business hours not more than three (3) days prior to the scheduled closing date.

(b)    If Purchaser is unable to conduct the personal inspection of the Unit with Seller, as required, Purchaser may designate a representative by written notice to Seller. Purchaser will be bound by the actions of its representatives.

(c)    During the personal inspection, Purchaser or Purchaser's representative and Seller will complete a list of Inspection items in the Unit which require Seller's attention. Purchaser and Seller will sign the list as conclusive evidence of the agreed upon work to be performed. When the agreed work has been performed (which will be within a reasonable time considering the availability of materials and the nature of the work to be performed) that will be deemed conclusively that: (1) Seller's obligations have been fulfilled, and (2) any additional items will be the responsibility of the Purchaser.

(d)    Any contractor of Purchaser will be allowed access to the Unit for construction work only subsequent to the later of: (1) completion of the personal inspection, (2) signing of the list of inspection items by Purchaser, and (3) closing.

(e)    It is agreed by the parties to this Contract that the fact that the parties have not completed the inspection, or that items listed on the inspection list have not been addressed by Seller, will not entitle Purchaser to delay closing or to withhold money due Seller at closing, and a refusal to close as scheduled or to pay the full purchase price at closing will constitute a default by the Purchaser. Seller's obligation to perform the work agreed upon in the list of inspection items will survive closing.

(f)    Failure of the Purchaser to conduct the personal inspection and complete and sign the list of inspection items by the date established in Paragraph 25 (a) of this Contract will be deemed to be: (1) conclusive of Purchaser's acceptance of the Unit; and (2) a complete waiver of all objections to defects in workmanship or materials as allowed by law.

(g)    The provisions of this paragraph shall survive the closing.

25.    **PROSPECTUS.** The Condominium documents required by Section 518.504, Florida Statutes, to be provided by Seller to Purchaser are defined as the Prospectus together with all Exhibits to it. Purchaser acknowledges receipt of the Prospectus and all Exhibits, as well as those disclosures as provided in the Prospectus described as "Disclosures Regarding the Condominium."

12


Purchaser
Purchaser

24. <u>INSPECTION PROCEDURE</u>.

(a) Purchaser is required to conduct a personal inspection of the Unit with Seller's representative at a mutually convenient time during Seller's normal business hours not more than three (3) days prior to the scheduled closing date.

(b) If Purchaser is unable to conduct the personal inspection of the Unit with Seller, as required, Purchaser may designate a representative by written notice to Seller. Purchaser will be bound by the actions of its representatives.

(c) During the personal inspection, Purchaser or Purchaser's representative and Seller will complete a list of Inspection items in the Unit which require Seller's attention. Purchaser and Seller will sign the list as conclusive evidence of the agreed upon work to be performed. When the agreed work has been performed (which will be within a reasonable time considering the availability of materials and the nature of the work to be performed) that will be deemed conclusively that: (1) Seller's obligations have been fulfilled, and (2) any additional items will be the responsibility of the Purchaser.

(d) Any contractor of Purchaser will be allowed access to the Unit for construction work only subsequent to the later of: (1) completion of the personal inspection, (2) signing of the list of inspection items by Purchaser, and (3) closing.

(e) It is agreed by the parties to this Contract that the fact that the parties have not completed the inspection, or that items listed on the inspection list have not been addressed by Seller at closing, will not entitle Purchaser to delay closing or to withhold money due Seller at closing, and a refusal to close as scheduled or to pay the full purchase price at closing will constitute a default by the Purchaser. Seller's obligation to perform the work agreed upon in the list of inspection items will survive closing.

(f) Failure of the Purchaser to conduct the personal inspection and complete and sign the list of inspection items by the date established in Paragraph 25 (a) of this Contract will be deemed to be: (1) conclusive of Purchaser's acceptance of the Unit; and (2) a complete waiver of all objections to defects in workmanship or materials as allowed by law.

(g) The provisions of this paragraph shall survive the closing.

25. <u>PROSPECTUS</u>. The Condominium documents required by Section 518.504, <u>Florida Statutes,</u> to be provided by Seller to Purchaser are defined as the Prospectus together with all Exhibits to it. Purchaser acknowledges receipt of the Prospectus and all Exhibits, as well as those disclosures as provided in the Prospectus described as "Disclosures Regarding the Condominium."

12

 _____ Purchaser
_____ Purchaser

26.   **DISCLOSURES.** Purchaser acknowledges the following:

     (a)      The Condominium is located adjacent to thoroughfares that may be affected by traffic and noise from time to time and may be improved or widened in the future.

     (b)      The views from a Unit may be changed over time due to among other things, additional development and the removal or addition of landscaping.

     (c)      No representations are made regarding the zoning of adjacent property, or that the category to which adjacent property is zoned may not change in the future.

     (d)      No representations are made regarding the schools that currently or may in the future serve the Condominium.

     (e)      Since in every neighborhood there are conditions which different people may find objectionable, it is acknowledged that there may be conditions outside of the Condominium property which Purchaser may find objectionable and that it shall be the sole responsibility of the Purchaser to become acquainted with neighborhood conditions which could affect the Unit.

     (f)      No representations are made that the Unit is or will be soundproof or that sound may not be transmitted from one Unit to another.

     (g)      The Condominium floor plans and the dimensions and square footage calculations shown thereon are only approximations. Any Purchaser who is concerned about any representations regarding the floor plans should do his/her own investigation as to the dimensions, measurements and square footage of his/her Unit.

     (h)      The Seller may be engaging in construction activities related to the construction of building(s), the Common Elements, the Shared Amenities (as defined in the Declaration), and the Condominium (as defined in the Declaration). Such construction activities may, from time to time, produce certain conditions on the Condominium, including, without limitation: (i) noise or sound that is objectionable because of its volume, duration, frequency or shrillness; (ii) smoke; (iii) noxious, toxic, or corrosive fumes or gases; (iv) obnoxious odors; (v) dust, dirt or flying ash; (vi) unusual fire or explosion hazards; (vii) temporary interruption of utilities; and/or (viii) other conditions that may threaten the security or safety of Persons on the Condominium. Notwithstanding the foregoing, all Owners and Occupants agree that such conditions on the Condominium resulting from construction activities shall not be deemed a nuisance and shall not cause Seller and its agents to be deemed in violation of any provision of this Declaration.

13

                                            _____ Purchaser
                                            _____ Purchaser

(i)    The Condominium building has been newly constructed pursuant to plans and specifications prepared by licensed professionals and permits issued by local government. During the course of the construction of any building, including the Condominium building, variations from the original plans and specifications, some of which add scope, some of which reduce scope, and some of which alter scope, are inevitable and can, do, and did occur as a matter of intention and/or as a matter of necessity. While the Condominium building was constructed according to standard building practices and building codes existing at the time of the submission of the plans and specifications for the building for permit, some code requirements may have changed during the interim period which were not incorporated into the design of the building. Certain portions of the Condominium Property may be renovated and said renovations may not be complete as of the recording of the Declaration. Seller shall complete said renovations in a commercially reasonable manner.

(j)    Exposed concrete surfaces in portions of the Condominium building which are not heated and cooled are subject to cracking due to conditions including, but not limited to: (A) water penetration; (B) expansion and contraction of the concrete with temperature changes; and (C) settlement of the Condominium building.

(k)    Condensation may appear on the interior portion of the windows and glass surfaces, and fogging of windows and glass surfaces may occur due to temperature disparities between the interior and exterior portions of the windows and glass.

(l)    *The following disclosure is required by Section 404.058, Florida Statutes, for all Contracts for Sale and Purchase of any building in Florida: "Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."*

(m)    Mold is found both indoors and outdoors. The presence of mold may cause property damage or health problems. Should you desire a mold inspection or additional information about mold, contact a professional trained in this field.

27.    SPECIAL STIPULATIONS. The following stipulations, if in conflict with any preceding provision, shall control:

(a)    Exhibits and Addenda. The Exhibits and/or Addenda that are attached hereto are by this reference made a part hereof.

(b)    Personal Property. The following items shall remain with the Unit in their present condition at no additional cost to Purchaser: washer/dryer, refrigerator,

14

X    Purchaser
    Purchaser

stove and dishwasher. Seller shall warrant unencumbered title thereto to Purchaser at Closing:

       (c)   <u>Statement by Salesperson</u>. Seller and Seller's Officers/employees are not responsible for, or bound by, any statement, representation and/or Contract made by a salesperson or other agents unless such statement, representation and/or Contract is in writing and signed by one of the Seller's authorized Officers. PURCHASER ACKNOWLEDGES THAT IN MAKING THIS PURCHASE PURCHASER IS NOT RELYING UPON ANY STATEMENT, REPRESENTATION OR CONTRACT MADE BY A SALESPERSON OR AGENT (EXCEPT AS MAY BE IN WRITING, AND SIGNED BY ONE OF SELLER'S AUTHORIZED OFFICERS.

       (d)   <u>Captions and Headings</u>.   Captions and paragraph headings contained in the Contract are for convenience and reference only and in no way define, describe, extend or limit the scope or interest of the Contract nor the interest of any provision hereof.

       (e)   <u>Clerical Errors</u>.  The Purchaser(s) agree(s), if requested by the Seller, to fully cooperate in correcting any clerical errors as may appear in the Contract.

     28.   <u>RESERVES</u>. Included in the information provided to Purchaser is the Estimated Operating Budget, Purchaser understands that the Estimated Operating Budget provides only an estimate of what it will cost to run the Association during the period of time stated in the Budget and the Budget is not guaranteed to accurately predict actual expenditures. It is intended that the Developer, as the sole Unit Owner upon the formation of the Condominium, will elect not to provide any reserves for the initial year of the Association. Thereafter, on an annual basis, a majority of the Association's total voting interest (which may include the Developer, to the extent permitted by law) may vote to continue not to provide any reserves. If an election is in fact made to waive reserves the Assessments per Unit will be as set forth in the Estimated Operating Budget as "Assessments without Reserves". If no such election is made, the Assessments per Unit will be as set forth in the Estimated Operating Budget as "Assessments per Unit – With Reserves.

     **29.   THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQURIED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, <u>FLORIDA STATUTES</u>. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE**

15

                                       ____ Purchaser
                                        ____ Purchaser

TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

30. FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

31. UNITS IN THIS CONDOMINIUM ARE SUBJECT TO TIMESHARE ESTATES.

The parties set their hands to this Contract on the dates as set forth to each signature below.

SELLER:

KA & KM Development, Inc.

BY: _____
     Vinod Kalidas, President

Date: MARCH 7, 2007

PURCHASER(S):

BY: _____          BY: _____
Signature                            Signature
Print Name: JAMES ROONEY              Print Name: TERESA ROONEY

Date: 02 - 09 - 2007                 Date: 02 - 09 - 2007

16

X ___ Purchaser
___ Purchaser

7-13

DBPR Form CO 6000-6
Effective: 8/26/04

## RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specification, made available for inspection.

Name of Condominium __Villas at Lake Eve, A Condominium__

Address of Condominium _____12388 International Drive South, Orland, FL 32821_____

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | N/A | |
| Declaration of Condominium | X | |
| Articles of Incorporation | X | |
| Bylaws | X | |
| Estimated Operating Budget | X | |
| Form of Agreement for Sale or Lease | X | |
| Rules & Regulations | N/A | |
| Covenants and Restrictions | N/A | |
| Ground Lease | N/A | |
| Management and Maintenance Contracts for More Than One Year | N/A | |
| Renewable Management Contracts | N/A | |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | |
| Declaration of Servitude | N/A | |
| Sales Brochures | N/A | |
| Phase Development Description | N/A | |
| Form of Unit Lease if a Leasehold | N/A | |
| Description of Management for Single Management of Multiple Condominiums | N/A | |
| Conversion Inspection Report | N/A | |
| Conversion Termite Inspection Report | N/A | |
| Plot Plan | X | |
| Floor Plan | X | |
| Survey of Land and Graphic Description of Improvements | X | |
| Frequently Asked Questions & Answers Sheet | X | |
| Financial information | N/A | |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | X | |
| Executed Escrow Agreement | X | |
| Other Documents (Insert Name of Document) | N/A | |
| Alternative Media Disclosure Statement | X | |
| Plans and Specifications | N/A | |

1

DEPR Form CO 6000-6
Effective: 8/26/04

THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.

Executed this ___ day of ___ JUNE ___, 20 07 .

_____
Signature of Purchaser or Lessee

_____
Signature of Purchaser or Lessee

2

Contract within said fifteen (15) days, Purchaser shall be conclusively deemed to have consented to the proposed change, Amendment, modification, or revision.

15. BROKERAGE AND AGENCY. Except as set forth below, Purchaser and Seller represent and warrant to the other that each party has not dealt with a broker, agent, or finder in connection with this transaction and Purchaser and Seller covenant and agree, each to the other, to indemnify and hold each other harmless from any and all losses, damages, costs and expenses including, but not limited to, attorneys' fees and court costs that may be incurred or suffered as a result of any claim for any fee, commission, or similar compensation with respect to this transaction made by any person or entity, whether or not such claim for any fee, commission, or similar compensation with respect to this transaction made by any person or entity is meritorious, Seller's broker in this transaction is _____ ("Seller's Broker"). Purchaser's broker in this transaction is _____ ("Purchaser's Broker"). Seller's Broker and Purchaser's Broker shall sometimes be referred to herein together as "Broker". Purchaser and Seller acknowledge that they have not relied upon any advice, representations or statements of Broker and waive and shall not assert any claims against the other involving the same.

16. FLOOR PLANS AND MODELS. Purchaser hereby acknowledges and agrees that any floor plans, renderings, drawings, and the like furnished by Seller to Purchaser which purport to depict the Unit, or any portion thereof, or the building containing the same, are merely approximations, and do not necessarily reflect the actual as-built conditions of the same. The Purchaser further acknowledges and agrees that the decorations, paint colors, carpet, wall textures, window treatments, hard surface floors, some mirrors and paneling, art work, furniture, furnishings, wallpaper, fixtures, applicants, and the like, contained in any model Unit of Villas at Lake Eve, a Condominium, are for demonstration purposes only, and are not included in the Unit which is the subject of this Contract or necessarily representative of the Unit. Additionally, utility locations and air conditioning condenser locations may vary between the model Unit(s) and other production Unit(s).

17. TIME OF ESSENCE. Time is of the essence of this Contract.

18. FORCE MAJEURE. Either party hereto shall be excused for the period of any delay in the performance of any obligations hereunder when such delay is occasioned by cause or causes beyond the control of the party whose performance is so delayed and the time for performance shall be automatically extended for a like period. Such causes shall include, without limitation, all labor disputes, war, warlike operations, invasion, rebellion, hostilities, military or usurped power, sabotage, government regulations or controls, fire or other casualty, inability to obtain any necessary materials or services, or acts of God.

19. SEVERABILITY. The provisions of this Contract are intended to be independent, and in the event any provision hereof should be declared by a court of

10

_____ Purchaser
_____ Purchaser

obligated to close this transaction if Purchaser has the ability to obtain a loan with the terms as described herein and/or any other loan for which Purchaser has applied and been approved.

11.   RENOVATION STATUS.  Purchaser acknowledges that there may be ongoing renovations to the Common Elements after Closing.  Purchaser acknowledges that Seller will not be obligated to give any reduction in the purchase price, or reimburse any expense, or place any funds in escrow due to ongoing renovations at the time of Closing.

12.   SURVIVAL OF CONTRACT.  All conditions or situations not fulfilled at time of Closing shall survive the Closing until such time as the conditions or stipulations are fulfilled.

13.   POSSESSION.  Possession of the Unit shall be delivered to Purchaser at the Closing, subject to any lease which may be in effect if the Unit is occupied.

14.   CONDOMINIUM DOCUMENTS.

(a)   Governing Documents.  Purchaser acknowledges that the Unit being purchased is a portion of the real property and improvements which have been or will be made subject to the Declaration referred to in Paragraph 1.  The nature and extent of the rights and obligations of the Purchaser in acquiring and owning the Unit will be controlled by and subject to the Declaration, as well as the Articles of Incorporation, the Bylaws, and the Rules and Regulations of the Association. Purchaser agrees to comply with all of the terms, conditions and obligations set forth therein.

(b)   Membership in Association.  Upon conveyance of title to the Unit to Purchaser, Purchaser shall automatically become a Member of the Association and shall be subject to the Assessment obligations and other provisions set forth in the Declaration, including the obligation of the Purchaser to pay a contribution to the working capital of the Association referred to in Paragraph 3 of this Contract.

(c)   Amendments to Documents.  Purchaser hereby acknowledges and agrees that Seller shall have the right to modify, change, revise and amend, without Purchaser's approval, any or all of the documents (other than this Contract), the drafts of which are contained in the Prospectus.  In the event the Seller shall make any Amendment, modification, change, or revision to the documents or materials contained in the Prospectus, then a copy of such shall be delivered to the Purchaser and, if such change, Amendment, revision or modification affects materially the rights of the Purchaser, then, the Purchaser shall have the option to (1) consent to such, or (2) within fifteen (15) days after receiving such a copy of such, terminate this Contact in writing in which event Purchaser's entire deposit shall be refunded and the parties herein shall have no rights or liabilities hereunder.  In the event Purchaser does not terminate this

9

_____ Purchaser
_____ Purchaser

b)  <u>Contribution to Capital of Association.</u>  In addition to all other sums due hereunder, Purchaser agrees at Closing to make a non-refundable contribution to the capital of the Association in an amount equal to two (2) months general Assessment of the Unit at the time of closing as well as the transfer fee of $100.00 per Unit.

(c)  <u>Proration of Assessments.</u>  The monthly Condominium Assessment due for the month during which closing takes place shall be prorated between the parties.  The full monthly Assessment shall thereafter be paid by Purchaser beginning on the first day of the next month following closing.

4.   <u>TITLE</u>

(a)  Prior to consummation of the sale contemplated by this Contract, Seller shall record the Declaration of Condominium. Title to the Unit shall be conveyed to Purchaser by special warranty deed, and title to the Unit shall be insurable or marketable and free and clear of all encumbrances, except as provided in subparagraph (b) below.

(b)  It is understood and agreed that Purchaser is purchasing the above referenced Condominium Unit subject to the items as hereinafter stated, and that title to the Unit which the Purchaser shall acquire pursuant to this Contract shall be good, marketable and or insurable, subject only to the following:

(i)  Conditions, restrictions, limitation, reservations, dedications, easements, licenses, existing zoning ordinances and other rights of governmental bodies and instruments of records, including, but not limited to, water, sewer, electric and other utility agreements of records.

(ii)  Facts which an accurate survey or personal inspection of the Unit would disclose.

(iii)  Taxes for the current year and subsequent years.

(c)  <u>RESPA Disclosure.</u>  As required by the Real Estate Settlement Procedures Act of 1974, Purchaser acknowledges that Seller has not directly or indirectly required Purchaser, as a condition of sale, to purchase either a fee Owners or mortgagees title insurance policy from any particular title company.  Purchaser may elect to obtain such insurance from a company of Purchasers choice and Purchaser shall pay, at closing, the title insurance premium for such policy.

5.  <u>CLOSING DATE.</u>  It is mutually agreed that the closing of the Unit (the Closing) shall be held on or before the Closing Date set forth on the first page hereof.  If a closing date is provided, then the closing shall take place on that date. If no date is provided, then the closing Date, the time, and place will be scheduled by the Seller.

4

_____  Purchaser
_____  Purchaser



INSTR 20070409189
OR BK 09315 PG 3633 PGS=13
MARTHA O. HAYNIE, COMPTROLLER
ORANGE COUNTY, FL
06/22/2007 09:24:19 AM
MTG DOC TAX 151,410.00
INTANG TAX 86,520.00
REC FEE 112.00

PREPARED BY AND RETURN TO:

Robert L. Mellen, III, Esq.
AKERMAN SENTERFITT
P.O. BOX 231
ORLANDO, FL 32802-0231

**DOCUMENTARY STAMP TAX IN THE AMOUNT OF $151,410.00 AND INTANGIBLE TAX IN THE AMOUNT OF $86,520.00 ARE BEING PAID UPON RECORDATION OF THIS MORTGAGE ON THE NOTE.**

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

    **THIS MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT** (the "Mortgage") dated as of June __, 2007, executed by **KA AND KM DEVELOPMENT, INC.**, a Florida corporation, having an address 10641 Holly Crest Drive, Orlando, Florida 32836 (hereinafter referred to as "Mortgagor"), in favor of **SUNTRUST BANK**, a Georgia corporation, having a mailing address of 5th Floor Tower (MC: FL Orlando 1054), 200 South Orange Avenue, Orlando, Florida 32801 (together with its successors and assigns, hereinafter referred to as "Mortgagee");

## WITNESSETH:

    That in consideration of the premises and in order to secure (a) the payment of (i) the principal, interest, reimbursement of amounts drawn under letters of credit, fees, expenses, indemnification and other sums whatsoever payable at any time on that certain Mortgage Note, dated the date hereof, executed by the Mortgagor in favor of the Mortgagee in the face amount of $43,260,000.00 (as the same may hereafter be modified, amended, renewed, extended or replaced from time to time, the "Note") or under the related Construction Loan Agreement, dated as of the date hereof, between the Mortgagor and the Mortgagee (as the same may hereafter be modified, amended, supplemented or restated from time to time, the "Loan Agreement;" the capitalized terms used herein and not otherwise defined having the meanings given to such terms in said Loan Agreement), any of the other Loan Documents or this Mortgage, and the performance and observance of all of the provisions of said Note, Loan Agreement, other Loan Documents and this Mortgage, (ii) any indebtedness, liabilities or obligations, now existing or hereafter arising, due or to become due, absolute or contingent, of the Mortgagor to the Mortgagee under any agreement (including terms and conditions incorporated by reference therein) which is (A) a rate swap agreement, basis swap, forward rate agreement, commodity swap, commodity option, equity or equity index swap, bond option, interest rate option, foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, or any similar agreement related to this transaction (including any option to enter into any of the foregoing); (B) any combination of the foregoing; or (C) a master agreement for any of the foregoing, entered into with the Mortgagee or any of its Affiliates, together with all supplements and schedules thereto and all amendments, modifications or replacements thereof, and (iii) any other Obligations, including without limitation, any obligations of the Mortgagor to the Mortgagee under this Mortgage, and (b) the performance and observance of all of the provisions of said Note, Loan Agreement, other Loan Documents, other Obligations and this Mortgage (collectively, the "Liabilities"), Mortgagor hereby grants, sells, warrants, conveys, assigns, transfers, mortgages and sets over and confirms unto Mortgagee, all of Mortgagor's estate, right, title and interest in, to and under all of that certain real property situate in Orange County, Florida, more particularly described on the attached Exhibit "A" and incorporated herein by reference (the "Property").

{01157542;1}

*Exhibit B*

**TOGETHER WITH** all other property of every kind and nature set forth and described in <u>Exhibit "B"</u> attached hereto and made a part hereof (collectively, the "Other Property," and together with the Property, collectively, the "Mortgaged Property"). To the extent any of the Mortgaged Property is deemed to be personal property or fixtures under the UCC, Mortgagor does hereby grant to Mortgagee a security interest in all of said personal property and fixtures. Further, to the extent that any part of the Mortgaged Property is in the form of cash or other securities and is deposited with or held by Mortgagee or any of Mortgagee's Affiliates, the security interest granted hereunder to Mortgagee shall continue to encumber all of Mortgagor's right, title and interest in and to such deposits, and Mortgagor specifically agrees that any such Affiliate of Mortgagee shall be deemed to be the duly designated agent of Mortgagee for purposes of holding possession of any such deposits, and further agrees that upon the occurrence of an Event of Default, Mortgagee or its agent as aforesaid may at any time and from time to time, without demand or notice, appropriate and set-off against and apply the same to the indebtedness evidenced by the Note and other amounts due or payable to Mortgagee hereunder;

**TO HAVE AND TO HOLD** the Mortgaged Property, together with all and singular the tenements, hereditament and appurtenances thereunto belonging or in any wise appertaining, including, but not limited to, any impact fee credits or rebates, sewer or water allocation rights or credits, and any other rights of Mortgagor with respect to said real property arising out of any agreements between Mortgagor and the County or other applicable Governmental Authority, together with the reversion and reversions thereof, and all the estate, right, title, interest, homestead, possession, claim and demand whatsoever, as well in law as in equity, of Mortgagor and unto the same, and every part thereof, with the appurtenances of Mortgagor in and to the same, and every part and parcel thereof unto Mortgagee.

Mortgagor warrants that Mortgagor has a good and marketable title to an indefeasible fee estate in the real property comprising the Mortgaged Property subject to no liens or encumbrances except such as Mortgagee has agreed to accept in writing, including without limitation, those specific liens and encumbrances set forth in Title Commitment No. 630700036 (as endorsed to the date hereof) issued to Mortgagee by or on behalf of Chicago Title Insurance Company in connection herewith which Mortgagee shall be deemed to have accepted by closing the Loan and advancing the proceeds thereof to Mortgagor (collectively, the "Permitted Encumbrances"), and Mortgagor covenants that this Mortgage is and will remain a valid and enforceable mortgage on the Mortgaged Property subject only to the Permitted Encumbrances. Mortgagor has full power and lawful authority to mortgage the Mortgaged Property in the manner and form herein done or intended hereafter to be done. Mortgagor will preserve such title and will forever warrant and defend the same to Mortgagee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons whomsoever.

Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every one of such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Mortgagee shall from time to time require in order to preserve the priority of the lien of this Mortgage or to facilitate the performance of the terms hereof.

MORTGAGOR HEREBY AUTHORIZES MORTGAGEE TO FILE A UCC-1 FINANCING STATEMENT AND/OR A UCC-3 AMENDMENT IN THE STATE OF FLORIDA OR IN ANY OTHER APPLICABLE JURISDICTION, INCLUDING WITHOUT LIMITATION, ORANGE COUNTY, FLORIDA, FROM TIME TO TIME TO INCORPORATE OR OTHERWISE SET FORTH THE DESCRIPTION OF ANY PART OF THE MORTGAGED PROPERTY THAT MAY BE DEEMED TO BE PERSONAL PROPERTY OR FIXTURES UNDER THE UCC. MORTGAGOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE UNDER THE UCC OR OTHERWISE TO FILE ANY CORRECTION STATEMENT, AMENDMENT OR TERMINATION FINANCING STATEMENT WITH ANY JURISDICTION RELATING TO THE FOREGOING COLLATERAL WITHOUT THE PRIOR WRITTEN CONSENT OF MORTGAGEE.

**PROVIDED HOWEVER**, that if Mortgagor shall pay or cause to be paid to Mortgagee the indebtedness in the principal sum of Forty-Three Million Two Hundred Sixty Thousand and 00/100 Dollars ($43,260,000.00), as evidenced by the Note, executed by Mortgagor and payable to the order of Mortgagee, with interest and upon the terms as provided therein, together with all other sums advanced by Mortgagee to or on behalf of Mortgagor pursuant to the Note (including any future advances hereunder), the Loan Agreement or this Mortgage, or otherwise due and owing by Mortgagor to Mortgagee at any time, and all of the other Liabilities, and shall perform all other

{01157542;1}

2

covenants and conditions of the Note, all of the terms of which Note are incorporated herein by reference as though set forth fully herein, and of any renewal, extension, modification or replacement thereof, and of this Mortgage, the Loan Agreement and such other Liabilities, then this Mortgage and the estate hereby created shall cease and terminate.

Mortgagor further covenants and agrees with Mortgagee as follows:

1. **PAYMENT OF NOTE.** Mortgagor shall pay all sums, including interest secured hereby, when due as provided for in the Note and any renewal, extension or modification thereof and in this Mortgage, all such sums to be payable in lawful money of the United States of America at Mortgagee's aforesaid principal office or at such other place as Mortgagee may designate from time to time in writing.

2. **PAYMENT OF TAXES AND FEES ON OR RELATED TO MORTGAGED PROPERTY.** Mortgagor shall pay when due, and before any delinquency or default shall occur, and without requiring any notice from Mortgagee, all taxes, assessments of any type or nature and other charges levied or assessed against the Mortgaged Property or this Mortgage and all revenue and maintenance or similar fees related to the Mortgaged Property which are necessary for the extension and continued availability of sewer treatment capacity for the Mortgaged Property and, in each case shall produce receipts therefor upon demand.

3. **PAYMENT OF ENCUMBRANCES.** Mortgagor shall immediately pay and discharge (or transfer in full to a bond) any lien or encumbrance (except for Permitted Encumbrances) against the Mortgaged Property which may be or become superior to this Mortgage and shall not permit any default or delinquency on any other lien or encumbrance, against the Mortgaged Property (including Permitted Encumbrances).

4. **DEPOSITS FOR TAXES AND INSURANCE.** If required by Mortgagee at any time, Mortgagor shall make monthly deposits with Mortgagee, in a non-interest bearing account, together with and in addition to interest and principal, of a sum equal to one-twelfth of the yearly taxes and assessments which may be levied against the Mortgaged Property, and (if so required) one-twelfth of the yearly premiums for insurance thereon. The amount of such taxes, assessments and premiums, when unknown, shall be estimated by Mortgagee. Such deposits shall be used by Mortgagee to pay such taxes, assessments and premiums when due. Any insufficiency of such account to pay such charges when due shall be paid by Mortgagor to Mortgagee on demand. If, by reason of any default by Mortgagor under any provision of this Mortgage, Mortgagee declares all sums secured hereby to be due and payable, Mortgagee may then apply any funds in said account against the entire indebtedness secured hereby. The enforceability of the covenants relating to taxes, assessments and insurance premiums herein otherwise provided shall not be affected except insofar as those obligations have been met by compliance with this paragraph. Mortgagee may from time to time at its option waive, and after any such waiver reinstate, any or all provisions hereof requiring such deposits, by notice to Mortgagor in writing. While any such waiver is in effect, Mortgagor shall pay taxes, assessments and insurance premiums as herein elsewhere provided.

5. **PAYMENT OF TAXES AND ASSESSMENTS ON MORTGAGE.** Mortgagor shall promptly pay all taxes and assessments assessed or levied under and by virtue of any state, federal or municipal law or regulation hereafter passed against Mortgagee upon this Mortgage or the debt hereby secured, or upon its interest under this Mortgage.

6. **INSURANCE.** Mortgagor shall keep the Mortgaged Property insured against loss or damage by fire, and all perils insured against by an extended coverage endorsement, and such other risks and perils as Mortgagee in its discretion may require, and shall comply, at all times, with all of the Insurance Requirements. The policy or policies of such insurance shall be in the form in general use from time to time in the locality in which the Mortgaged Property is situated, shall be in such amount as Mortgagee may reasonably require, shall be issued by a company or companies licensed in the State of Florida and rated "A-" or better according to the current Best's Key Rating Guide, shall contain a standard mortgagee clause with loss payable to Mortgagee by New York Standard or Union Standard long form endorsements and shall specifically provide that the same shall not be canceled or modified adversely to the interest of Mortgagee without thirty (30) days prior written notice to Mortgagee by the insurer. Whenever required by Mortgagee, copies of such policies shall be delivered immediately to and held by Mortgagee. Any and all amounts received by Mortgagee under any of such policies may be applied by Mortgagee on the indebtedness secured hereby in such manner as Mortgagee may, in its sole discretion, elect or, at the option of

{01157542;1}

3

Mortgagee, the entire amount so received or any part thereof may be released. Notwithstanding the immediately preceding sentence, as to all such insurance proceeds received by Mortgagee, Mortgagee agrees that such proceeds may be used for repair or restoration of the damaged improvements on the property if the following conditions are fulfilled by Mortgagor to Mortgagee's satisfaction: (a) no Default has occurred and is continuing, (b) Mortgagee reasonably determines that such insurance proceeds are sufficient to complete such repair or restoration of the improvements, (c) the Mortgaged Property's income is sufficient to meet scheduled debt service and pay all ordinary and necessary operating expenses including, but not limited to, taxes, insurance and reserves for capital replacements, (d) such repair or restoration of the improvements can be fully accomplished and a certificate of occupancy obtained within a reasonable time and, in any event, prior to the Maturity Date, (e) such repair or restoration shall be done in accordance with plans and specifications approved by Mortgagee and any Governmental Authority having jurisdiction over such improvements and/or the Mortgaged Property and all necessary permits shall have been issued for the purpose of such repair or restoration, (f) Mortgagee may impose, in its sole discretion, such requirements and disbursement procedures to insure that by the expenditure of the insurance proceeds the damage to the improvements and the Mortgaged Property will be fully repaired or restored, free and clear of all liens, except for the lien of Mortgagee's first mortgage, (g) no waiver of payments due pursuant to the Note, this Mortgage or any of the other Loan Documents occurs while the improvements are being repaired or restored, (h) the insurance carrier does not deny liability as to Mortgagor and the Mortgaged Property, and (i) Mortgagor promptly complies with such other terms and conditions as Mortgagee may reasonably require. If any one of the above requirements and conditions are not met to Lender's satisfaction, the insurance proceeds shall be applied by Mortgagee as set forth in the immediately preceding sentence. If all of the requirements and conditions are met to Mortgagee's satisfaction, the insurance proceeds shall be disbursed periodically in accordance with procedures established by Mortgagee, in its sole discretion, as repair or restoration work with respect to the improvements is completed. Neither the application nor the release of any such amounts shall cure or waive any default under this Mortgage. Upon exercise of the power of sale given in this Mortgage or other acquisition of the Mortgaged Property or any part thereof by Mortgagee, such policies and all amounts paid or payable thereunder shall become the absolute property of Mortgagee.

7. **CONSENT TO CHANGES IN MORTGAGED PROPERTY.** Mortgagor shall first obtain the written consent of Mortgagee, which consent shall not unreasonably be withheld or delayed by Mortgagee, before: (a) removing or demolishing any building now or hereafter erected on the Mortgaged Property; (b) altering the arrangement, design or structural character thereof; (c) making any repairs which involve the removal of structural parts or the exposure of the interior of such building to the elements; (d) removing or exchanging any tangible personal property which is part of the Mortgaged Property unless no longer needed and promptly replaced by items of equal or greater value serving similar functions or purposes; or (e) entering into or modifying any leases of the Mortgaged Property, except as otherwise permitted by the Loan Agreement.

8. **MAINTENANCE OF MORTGAGED PROPERTY.** Mortgagor shall maintain the Mortgaged Property in good condition and repair including, but not limited, to the making of such repairs as Mortgagee may from time to time determine to be necessary for the preservation of the Mortgaged Property and not to commit or permit any waste thereof, and Mortgagee shall have the right to inspect the Mortgaged Property on reasonable notice to Mortgagor.

9. **COMPLIANCE WITH LAWS, ETC.** Mortgagor shall comply with all Legal Requirements and with covenants, conditions and restrictions affecting the Mortgaged Property, including, without limitation, to the extent applicable, The Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101 *et seq.*) and the Florida Americans with Disabilities Accessibility Implementation Act and all rules and regulations promulgated thereunder, as such Acts, rules and regulations may from time to time be amended or modified, and shall not cause or permit any violation thereof.

10. **FAILURE TO PAY ENCUMBRANCES.** If Mortgagor fails (a) to pay any claim, lien or encumbrance on the Mortgaged Property, regardless of whether it is superior or junior to this Mortgage; provided, however, this clause shall not by itself authorize or permit any placement of a junior encumbrance on the Mortgaged Property if otherwise prohibited by the remaining terms of this Mortgage, or when due, any tax or assessment or insurance premium or (b) to keep the Mortgaged Property in repair, or shall commit or permit waste, or if there be commenced any action or proceeding affecting the Mortgaged Property or the title thereto, or the interest of Mortgagor therein including, but not limited to, eminent domain and bankruptcy or reorganization proceedings, then

{01157542;1}

4

Mortgagee, at its option, may, but is not required to, pay said claim, lien, encumbrance, tax, assessment or premium, with right of subrogation thereunder, may make such repairs and take such steps as it deems advisable to prevent or cure such waste, and may appear in any such action or proceeding and retain counsel therein, and take such action therein as Mortgagee deems advisable, and for any of such purposes Mortgagee may advance such sums of money, including all costs, reasonable attorneys' fees and other items of expense as it deems necessary and all of such sums of money shall be secured by the lien of this Mortgage. Mortgagee shall be the sole judge of the legality, validity and priority of any such claim, lien, encumbrance, tax, assessment and premium and of the amount necessary to be paid in satisfaction thereof. Mortgagee shall not be held accountable for any delay in making any such payment, which delay may result in any additional interest, costs, charges, expenses or otherwise.

11.  **PAYMENT OF ADVANCES.** Mortgagor will pay to Mortgagee, immediately upon demand, all sums of money advanced by Mortgagee to protect the security hereof pursuant to this Mortgage, including without limitation, all costs reasonably incurred by Mortgagee in evaluating or correcting dangerous, harmful or unlawful conditions found to exist on or about the Mortgaged Property, reasonable attorneys' fees and other items of expense, together with interest on each such advancement at the highest lawful rate of interest per annum allowed by the law of the State of Florida from time to time, and all such sums and interest thereon shall be secured hereby.

12.  **ASSIGNMENT OF RENTS.** This Mortgage also constitutes an assignment of rents for the purposes of Florida Statutes Section 697.07. The Mortgagor does hereby assign to the Mortgagee its entire right, interest and position as lessor, with respect to all leases or rental arrangements executed or delivered both oral and written now existing or hereafter made or existing, together with all extensions, renewals, modifications or replacements of said leases, occupancy agreements and rental arrangements and together with any and all guaranties of the obligations of the lessees and occupants, and all extensions and renewals of said guaranties, all of which are hereinafter collectively referred to as "leases," with respect to the Mortgaged Property. The Mortgagor does hereby empower the Mortgagee, its agents or attorneys, upon the occurrence of an Event of Default, to collect, sue for, settle, compromise and give acquittances for all of the rents that may become due under said leases and avail itself of and pursue all remedies for the enforcement of said leases and the Mortgagor's rights in and under said leases as the Mortgagor might have pursued but for this assignment. With respect to any leases encumbering the Mortgaged Property, the Mortgagor agrees as follows:

a.    The Mortgagor has not heretofore and will not in the future assign or pledge any interest in the same without the Mortgagee's prior written consent;

b.    No rent shall be paid by any of the leases for more than one month in advance (excluding, however, payment of last month's rent and security deposits), and the payment of none of the rents to accrue under said leases has been or will be waived, released, reduced, discounted or otherwise discharged or compromised by the Mortgagor directly or indirectly by assuming any lessee's obligations with respect to other premises; and

c.    The Mortgagor shall perform all of the Mortgagor's covenants and agreements as lessor under said leases.

d.    Except in the ordinary course of business, the Mortgagor shall not sell, transfer, or remove any personal property owned by the Mortgagor now or hereafter located on the Mortgaged Property, unless such action results in substitution or replacement with similar items of equal value, owned by the Mortgagor and not otherwise encumbered, without the prior written consent of the Mortgagee;

e.    Upon request, the Mortgagor shall furnish the Mortgagee with true and correct copies, as signed, of all leases;

f.    Upon issuance of a deed or deeds pursuant to foreclosure of this Mortgage, all right, title, and interest of the Mortgagor in and to said leases shall, by virtue of this instrument, thereupon vest in and become the absolute property of the grantee or grantees in such deed or deeds without any further act or assignment by the Mortgagor. The Mortgagor hereby irrevocably appoints the Mortgagee and its successors and assigns, as its agent and attorney in fact, to execute all instruments of assignment or further assurances in favor of such grantee or grantees in such deed or deeds, as may be necessary or desirable for such purpose; provided, however, nothing contained herein shall prevent the Mortgagee from terminating any subordinate lease through such foreclosure; and

{01157542;1}

5

g.  Although it is the intention of the parties that this instrument shall be a present assignment, it is expressly understood and agreed, anything herein contained to the contrary notwithstanding, that the Mortgagee shall not exercise any of the rights or powers herein conferred upon it until an Event of Default shall occur and be continuing but, upon the occurrence of any such Event of Default, the Mortgagee shall be entitled, upon notice to the lessees, to all rents and other amounts then due under the leases and thereafter accruing, and this Assignment shall constitute a direction to and full authority to the lessees to pay all such amounts to the Mortgagee without proof of the Event of Default relied upon. The lessees are hereby irrevocably authorized to rely upon and comply with (and shall be fully protected in so doing) any notice or demand by the Mortgagee without verification of any signatures for the payment to the Mortgagee of any rental or other sums which may be or thereafter become due under the leases and shall have no right or duty to inquire as to whether any Event of Default has actually occurred or is then existing.

12.  **AMOUNTS ABSOLUTELY DUE.** Mortgagor shall pay all sums of money secured hereby without any relief whatever from any valuation or appraisement laws.

13.  **EVENTS OF DEFAULT; REMEDIES.** Upon the happening and during the continuance of any Event of Default (as defined in the Loan Agreement), all of the indebtedness secured hereby shall become and be immediately due and payable at the option of Mortgagee, without notice or demand which are hereby expressly waived, in which event Mortgagee may (but shall be under no duty or obligation to) avail itself of all rights and remedies, at law or in equity, including without limitation, those available to a secured party upon default under the UCC, and this Mortgage may be foreclosed with all rights and remedies afforded by the laws of the State of Florida and Mortgagor shall pay all costs and expenses incurred by Mortgagee in (a) enforcing this Mortgage; (b) preserving, securing or protecting the Mortgaged Property; (c) evaluating any conditions on or about the Mortgaged Property, including environmental assessments, surveys or studies; (d) realizing upon the Mortgaged Property or any part thereof; and (e) collecting any of the indebtedness secured hereby, including without limitation reasonable attorneys' fees whether suit is brought or not and whether incurred in connection with collection, at trial, on rehearing, retrial or appeal, in bankruptcy or otherwise. The indebtedness secured hereby shall bear interest at the Interim Default Rate or the Default Rate, whichever is applicable under the Loan Agreement, from and after the date of any such default of Mortgagor. If the Note provide for installment payments, Mortgagee may, at its option, collect a late charge as may be provided for in the Note, to reimburse Mortgagee for expenses in collecting and servicing such installment payments.

14.  **RIGHT TO RECEIVER ON DEFAULT.** Upon the happening and during the continuance of any Event of Default:

a.  Mortgagee is authorized at any time, without notice, in its sole discretion to enter upon and take possession of the Mortgaged Property or any part thereof, to perform any acts Mortgagee deems necessary or proper to conserve the security and to collect and receive all rents, issues and profits thereof, including those past due as well as those accruing thereafter; and

b.  Mortgagee shall be entitled, as a matter of strict right, without notice and ex parte, and without regard to the value or occupancy of the security, or the solvency of Mortgagor, or the adequacy of the Mortgaged Property as security for the Note, to have a receiver appointed to enter upon and take possession of the Mortgaged Property, collect the rents and profits therefrom and apply the same as the court may direct, such receiver to have all the rights and powers permitted under the laws of Florida.

In either such case, Mortgagee or the receiver may also take possession of, and for these purposes use, any and all personal property which is a part of the Mortgaged Property and used by Mortgagor in or arising from the sale, rental or leasing thereof or any part thereof. The expense (including receiver's fees, counsel fees, costs and agent's compensation) incurred pursuant to the powers herein contained shall be secured hereby. Mortgagee shall (after payment of all costs and expenses incurred) apply such rents, issues, proceeds and profits received by it on the indebtedness secured hereby in such order as Mortgagee determines. The right to enter and take possession of the Mortgaged Property, to manage and operate the same, and to collect the rents, issues, proceeds and profits thereof, whether by a receiver or otherwise, shall be cumulative to any other right or remedy hereunder or afforded by law,

{O1157542;1}  6

and may be exercised concurrently therewith or independently thereof. Mortgagee shall be liable to account only for such rents, issues, proceeds and profits actually received by Mortgagee.

15. **CUMULATIVE RIGHTS ON DEFAULT.** If the indebtedness secured hereby is now or hereafter further secured by mortgages, security interests, financing statements, pledges, contracts of guaranty, assignments of leases or other securities, or if the Mortgaged Property hereby encumbered consists of more than one parcel of real property, Mortgagee may, at its option, exhaust any one or more of said securities and security hereunder, or such parcels of the security hereunder, either concurrently or independently, and in such order as it may determine.

16. **FUTURE ADVANCES.** This Mortgage shall secure not only existing indebtedness, but also such future advances, whether such advances are obligatory or to be made at the option of Mortgagee or otherwise, as are made within twenty (20) years from the date hereof, to the same extent as if such future advances were made on the date of the execution of this Mortgage, but such secured indebtedness shall not exceed at any time the maximum principal amount of two times the original principal amount of the Note, plus interest thereon, and any disbursements made for the payment of taxes, levies or insurance on the Mortgaged Property with interest on such disbursements. Any such future advances, whether obligatory or to be made, at the option of the Mortgagee or otherwise, may be made either prior to or after the due date of the Note or any other Liabilities secured by this Mortgage. This Mortgage is given for the specific purpose of securing any and all indebtedness by the Mortgagor to Mortgagee (but in no event shall the secured indebtedness exceed at any time the maximum principal amount set forth in this paragraph) in whatever manner this indebtedness may be evidenced or represented until this Mortgage is satisfied of record. All covenants and agreements contained in this Mortgage shall be applicable to all further advances made by Mortgagee to Mortgagor under this future advance clause. Mortgagor agrees that it will not, without the consent of Mortgagee, execute and record any notice limiting the right of Mortgagee to make or Mortgagor to accept future advances hereunder.

17. **NO WAIVER.** No delay by Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by law, shall operate as a waiver thereof or preclude the exercise thereof during the continuance of any Event of Default hereunder. No waiver by Mortgagee of any Event of Default shall constitute a waiver of or consent to subsequent Events of Default. No failure of Mortgagee to exercise any option herein given to accelerate maturity of the debt hereby secured; no forbearance by Mortgagee before or after the exercise of such option and no withdrawal or abandonment of foreclosure proceedings by Mortgagee shall be taken or construed as a waiver of its right to exercise such option or to accelerate the maturity of the debt hereby secured by reason of any past, present or future default on the part of Mortgagor; and, in like manner, the procurement of insurance or the payment of taxes or other liens or encumbrances by Mortgagee shall not be taken or construed as a waiver of its right to accelerate the maturity of the debt hereby secured.

18. **PARTIAL RELEASE.** Without affecting the liability of Mortgagor or any other Person (except any Person expressly released in writing) for payment of any indebtedness secured hereby or for performance of any obligation contained herein, and without affecting the rights of Mortgagee with respect to any security not expressly released in writing, Mortgagee may, at any time and from time to time, either before or after the maturity of the Note, and without notice or consent:

    a.   Release any Person liable for payment of all or any part of the indebtedness evidenced by the Note or for performance of any of the other Liabilities;

    b.   Make any agreement extending the time or otherwise altering the terms of payment of all or any part of the indebtedness evidenced by the Note, or modifying or waiving any of the other Liabilities, or subordinating, modifying or otherwise dealing with the lien or charge hereof;

    c.   Exercise or refrain from exercising or waive any right Mortgagee may have;

    d.   Accept additional security of any kind; and

    e.   Release or otherwise deal with any property, real or personal, securing the indebtedness, including all or any part of the Mortgaged Property.

{01157542;1}

7

19. **NO FURTHER LIENS OR ENCUMBRANCES.** Mortgagor shall not grant to any other Person whatsoever any lien, mortgage or other encumbrance whatsoever on any of the Mortgaged Property, nor shall Mortgagor enter into any contract to sell or otherwise sell any portion of the Mortgaged Property without Mortgagee's prior written consent unless, in the case of any such sale, this Mortgage is to be paid in full and satisfied upon closing of such sale. Any such mortgage or encumbrance in violation hereof shall be invalid and shall not constitute a lien on the Mortgaged Property.

20. **PRIORITY OVER FUTURE LIENS.** Any amendment or modification of this Mortgage hereafter made by Mortgagor and Mortgagee pursuant to this Mortgage shall be superior to the rights of the holder of any lien, mortgage or encumbrance on the Mortgaged Property arising subsequent to the date of this Mortgage (provided, however, that this clause shall not by itself authorize or permit any subsequent liens, mortgages or encumbrances on the Mortgaged Property which are otherwise prohibited under the terms of this Mortgage).

21. **CONDEMNATION.** In the event of condemnation proceedings of the Mortgaged Property or any part thereof, the award or compensation payable thereunder is hereby assigned to and shall be paid to Mortgagee. Mortgagee shall be under no obligation to question the amount of any such award or compensation and may accept the same in the amount in which the same shall be paid. In any such condemnation proceedings, Mortgagee may be represented by counsel selected by Mortgagee. The proceeds of any award or compensation so received shall, at the option of Mortgagee, either be applied to the prepayment of the Note and at the rate of interest provided therein, regardless of the rate of interest payable on the award by the condemning authority, or at the option of Mortgagee, such award shall be paid over to Mortgagor for restoration of the Mortgaged Property. Notwithstanding the immediately preceding sentence, Mortgagee agrees that such condemnation proceeds may be used for restoration of the improvements on the Property, and shall be disbursed periodically from an escrow account in accordance with customary construction lending procedures established by Mortgagee as restoration of the improvements is completed, if each the following conditions is met: (a) no Default has occurred and is continuing, (b) Mortgagee reasonably determines that such condemnation proceeds are sufficient to complete such restoration of the improvements, (c) the Mortgaged Property's income is sufficient to meet scheduled debt service and pay all ordinary and necessary operating expenses including, but not limited to, taxes, insurance and reserves for capital replacements, (d) such repair or restoration of the improvements can be fully accomplished and a certificate of occupancy obtained within a reasonable time and, in any event, prior to the Maturity Date, (e) such restoration shall be done in accordance with plans and specifications approved by Mortgagee and any Governmental Authority having jurisdiction over such improvements and/or the Mortgaged Property and all necessary permits shall have been issued for the purpose of such restoration, (f) prior to the release of any condemnation proceeds, Mortgagor shall have delivered to Mortgagee evidence satisfactory to Mortgagee, in its sole discretion, that Mortgagor will be allowed to repair, reconstruct and use the damaged improvements for the same use thereof immediately prior to the date of the casualty (such proof shall include, without limitation, all necessary building and other permits and governmental approvals), (g) Mortgagee may impose, in its sole discretion, such requirements and disbursement procedures to insure that by the expenditure of the condemnation proceeds, the restoration of the improvements and the Mortgaged Property will be fully completed, free and clear of all liens, except for the lien of Mortgagee's first mortgage, (h) no waiver of payments due pursuant to the Note, this Mortgage or any of the other Loan Documents occurs while the improvements are being restored, and (i) Mortgagor promptly complies with such other terms and conditions as Mortgagee may reasonably require. If any one of the above requirements and conditions are not met to Lender's satisfaction, the condemnation proceeds shall be applied by Mortgagee as set forth in the immediately preceding sentence. If all of the requirements and conditions are met to Mortgagee's satisfaction, the condemnation proceeds shall be disbursed periodically in accordance with procedures established by Mortgagee, in its sole discretion, as restoration work with respect to the improvements is completed.

22. **DUE ON SALE.** The Loan represented by this Mortgage and the Note is personal to Mortgagor and Mortgagee made the Loan to Mortgagor based upon the credit of Mortgagor and Mortgagee's judgment of the ability of Mortgagor to repay all sums due under this Mortgage, and therefore this Mortgage may not be assumed by any subsequent holder of an interest in the Mortgaged Property. If all or any part of the Mortgaged Property or any interest therein, is sold, conveyed, transferred (including a transfer by agreement for deed or land contract) or further encumbered by Mortgagor without Mortgagee's prior written consent then (except as otherwise expressly permitted in the Loan Agreement), in that event, Mortgagee may declare all sums secured by this Mortgage immediately due and payable.

{01157542;1}

8

23. **GOOD STANDING OF MORTGAGOR**. Mortgagor represents and warrants that it is now and will be during the term of this Mortgage a duly formed and validly existing corporation under the laws of the State of Florida with full power and authority to consummate the loan contemplated hereby.

24. **SEVERABILITY**. In the event any one or more of the provisions contained in this Mortgage or in the Note shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall, at the option of the Mortgagee, not affect any other provisions of this Mortgage, and this Mortgage shall then be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein. The total interest payable pursuant to the Note or this Mortgage shall not in any one year exceed the highest lawful rate of interest allowed by the law of the State of Florida.

25. **SUCCESSORS AND ASSIGNS**. The covenants and agreements herein contained shall bind, and the benefits and advantages shall inure to the respective legal representatives, successors and assigns of the parties hereto.

26. **MISCELLANEOUS**. Wherever used, the singular number shall include the plural, the plural the singular and the use of any gender shall be applicable to all genders. If more than one Mortgagor executes this Mortgage, the term "Mortgagor" includes each of the mortgagors, and all covenants, agreements and undertakings hereunder shall be joint and several. Time is of the essence of this Mortgage. The captions set forth to the paragraphs in this Mortgage are for convenience only and do not limit, expand or define the terms and conditions of this Mortgage.

27. **LOAN AGREEMENT**. Mortgagor hereby covenants that it will comply with all of the terms, provisions and covenants of the Loan Agreement, all of which terms are incorporated herein by reference as though set forth fully herein, and will diligently construct the Project to be built pursuant to the terms thereof and will permit no defaults to occur thereunder and, if a default shall occur thereunder which is not cured within the applicable curative period, if any, it shall constitute a default under this Mortgage and the Note.

28. **ARBITRATION; VENUE; WAIVER OF JURY TRIAL. IN THE EVENT ANY DISPUTE SHOULD ARISE UNDER THIS MORTGAGE, SAID DISPUTE WILL, AT MORTGAGEE'S ELECTION, BE RESOLVED THROUGH BINDING ARBITRATION AND IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION OR ANY LOCAL ARBITRATION ASSOCIATION SELECTED BY MORTGAGEE. MORTGAGEE MAY ENFORCE THIS MORTGAGE AND ITS REMEDIES UNDER ANY OF THE SECURITY DOCUMENTS IN A JUDICIAL PROCEEDING AND, AT THE SAME TIME, ELECT TO HAVE ANY OTHER DISPUTES BETWEEN THE PARTIES RESOLVED BY BINDING ARBITRATION INCLUDING ANY CLAIM, CROSSCLAIM OR COUNTERCLAIM WHICH MORTGAGOR MAY ASSERT IN ANY SUCH JUDICIAL PROCEEDING. IF LEGAL ACTION ENSUES BETWEEN MORTGAGEE AND MORTGAGOR, THE EXCLUSIVE VENUE FOR ANY SUCH ACTION SHALL BE ORANGE COUNTY, FLORIDA AND EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION ARISING OUT OF, OR BASED UPON, THIS MORTGAGE.**

29. **COMPLETE AGREEMENT**. This Mortgage constitutes the complete agreement between the parties hereto and it may not be amended, changed or modified except by a writing signed by the party to be charged by said amendment, change or modification.

30. **GOVERNING LAW**. This Mortgage shall be governed by the laws of the State of Florida.

*[Signatures follow on next page]*

{01157542;1}

9

**IN WITNESS WHEREOF**, Mortgagor has duly executed this Mortgage as of the day and year first above written.

Signed, sealed & delivered
in the presence of:

**MORTGAGOR:**

**KA AND KM DEVELOPMENT, INC.,**
a Florida corporation

Name:

Name: _PETER G. LATTIMER_

By: _____
Name: Vinod Kalidas
Title: President

**STATE OF FLORIDA**

**COUNTY OF ORANGE**

The foregoing instrument was acknowledged before me this ___ day of June, 2007, by Vinod Kalidas, as President of **KA AND KM DEVELOPMENT, INC.**, a Florida corporation, on behalf of the corporation.

Signature of Notary Public-State of Florida

_MARY FAITH PINSON_
Print, type or stamp name: Notary Public, State of Florida
Personally Known _____
Produced Identification _____
Type of Identification ___N/A___

(NOTARIAL SEAL)

Mary Faith Pinson
MY COMMISSION # DD404165 EXPIRES
May 3, 2009
BONDED THRU TROY FAIN INSURANCE, INC

{01157542;1}

10

EXHIBIT "A"

Legal Description of Property

All of Lots 2 and 31, W.R. MUNGER'S SUBDIVISION OF SECTION 23, TOWNSHIP 24 SOUTH, RANGE 28 EAST, according to the plat thereof as recorded in Plat Book "E", Page 22, of the Public Records of Orange County, Florida;

**LESS AND EXCEPT PORTIONS CONVEYED IN O.R. BOOK 3949, PAGE 3905, AS MORE PARTICULARLY DESCRIBED AS FOLLOWS:**

International Drive Extension (Edna P. Weltner and Evelyn P. Ortman); That part of Lot 31 of W.R. Munger's Subdivision of Section 23, Township 24 South, Range 28 East, as recorded in Plat Book "E", Page 22, of the Public Records of Orange County, Florida being more particularly described as follows: Commence at the Northeast corner of said Section 23; thence run South 00 degrees 01 minutes 13 seconds East along the East line of said Section 23 a distance of 1,167.28 feet; thence departing said East line run South 72 degrees 09 minutes 56 seconds West a distance of 346.70 feet to the East line of Lot 31 for a Point of Beginning; thence run South 00 degrees 00 minutes 22 seconds East along said East line a distance of 103.17 feet to the South line of Lot 31; thence run North 89 degrees 53 minutes 54 seconds West along said South line a distance of 318.94 feet; thence departing said South line run North 72 degrees 09 minutes 56 seconds East a distance of 335.02 feet to the Point of Beginning.



{01157542;1}                                  11

## Description of Other Property

All the following described property:

(a)     All of the structures, buildings and improvements now or hereafter situated upon the Property.

(b)     Any and all easements, rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, air rights, water, water stock, water rights, titles, interests, privileges, tenements, hereditaments and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the Property or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Mortgagor, and the reversion and reversions, remainder and remainders, rents, issues, profits thereof, and all of the estate, right, title, interest, property, possession, claim and demand whatsoever at law, as well as in equity, of Mortgagor of, in and to the same.

(c)     All right, title and interest of Mortgagor, if any, in and to the land lying in the bed of any streets, roads or avenues, opened or proposed, in front of or adjoining the Property, and in and to the appurtenances thereto.

(d)     All rents, profits, issues and revenue of the Property and the buildings on the Property from time to time accruing, whether under leases or tenancies now existing or hereafter created.

(e)     All of Mortgagor's right, title and interest in and to any judgments, awards of damages, condemnation payments and settlements, including interest thereon, and the right to receive the same, which may be made with respect to the Property as a result of the exercise of the right of eminent domain, the alteration of the side of any street, any other injury or a decrease in the value of the Property, or proceeds of insurance awards.

(f)     All machinery, apparatus, equipment, fittings, fixtures and tangible personal property of every kind and nature whatsoever purchased or acquired with the proceeds of the Loan, all additions thereto, and all substitutions and replacements therefor.

(g)     Mortgagor's interest in all purchase and sale contracts and/or leases of the Property or portions thereof now existing or hereafter entered into by Mortgagor, and all right, title and interest of Mortgagor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the buyers or lessees, as applicable, of their obligations thereunder and other payments whatsoever with respect thereto, subject, however, to the terms of the purchase and sale contracts or leases, as applicable, pursuant to which such deposits are held.

(h)     All deposits made with, or other security given to, utility companies by Mortgagor or any partner of Mortgagor with respect to the Property.

(i)     All of Mortgagor's rights relating to the Property or the operation thereof, or used in connection therewith, including, without limitation, the non-exclusive right to use trade names, service marks and trademarks.

(j)     All rights to any permits, licenses, authorizations and approvals granted to or otherwise held by the Mortgagor in regard to the Property such as, but not limited to, all building permits, certificates of occupancy, etc.

(k)     All rights of the Mortgagor to any contracts relating to the Property such as, but not limited to, all contracts with any general contractors or subcontractors with regard to improvements to be constructed on the Property, engineering contracts, architectural contracts, marketing contracts,

{01157542;1}       12

management contracts, etc. and to any engineering, architectural, marketing and other plans, drawings and specifications in connection therewith.

(l)   All intangible rights of the Mortgagor regarding the Property such as, but not limited to, all impact fee credits, sewer and water fee credits, sewer and water rights, and development rights, including, but not limited to, rights regarding concurrency and the right to develop.

(m)   All of Mortgagor's rights under any payment bonds and/or performance bonds regarding any development and/or construction on the Property.

(n)   All of Mortgagor's rights in any construction and other materials stored on the Property or elsewhere.

(o)   All of Mortgagor's rights under any warranties (seller's, manufacturer's, contractor's or other), service or maintenance contracts or guaranties, relating to development of the Property or the equipping thereof.

(p)   All deposit balances, accounts, items, certificates of deposit and monies of Mortgagor in possession of or on deposit with Mortgagee, including without limitation, any interest reserve, equity deposit, cash collateral, construction or other account established or maintained with respect to Mortgagee's loan to Mortgagor.

(q)   All proceeds of the conversion, voluntary or involuntary, or any of the foregoing into cash or liquidated claims, including proceeds of insurance and condemnation awards.



{O1157542:1}

13